1              UNITED STATES DISTRICT COURT

2                    DISTRICT OF OREGON

3                   PORTLAND DIVISION

4

5  RICHARD BRASKETT,              )
                                  )
6              Plaintiff,         )      No. 03:11-cv-01078-HU
                                  )
7       v.                        )
                                  )
8  CELESTE FENDER and NATHAN      )   **MEMORANDUM OPINION AND ORDER**
   TOBEY,                         )   **ON MOTION FOR SUMMARY JUDGMENT**
9                                 )
               Defendants.        )
10 └─────────────────────────────┘)

11

12

13 Kevin Keaney
   Kevin Keaney, P.C.
14 1631 N.E. Broadway, #540
   Portland, OR 97232
15
                 Attorney for Plaintiff
16

17 Jennifer Johnston
   Deputy City Attorney
18 Robert Yamachika
   Deputy City Attorney
19 Office of City Attorney
   221 S.W. 4th Avenue, Room 430
20 Portland, OR 97204

21              Attorneys for Defendants

22

23

24

25 HUBEL, Magistrate Judge:

26      The plaintiff Richard Braskett brings this action under 42

27 U.S.C. § 1983, for alleged violations of his constitutional rights

28 by the defendants, in connection with events that occurred in April

1 - MEMORANDUM OPINION AND ORDER

1 2010.    The defendant Celeste Fender is a Detective with the
2 Portland Police Bureau ("PPB"), and the defendant Nathan Tobey is
3 a PPB Officer.    At the time of the incidents in question, both
4 Fender and Tobey were assigned to the PPB's Domestic Violence
5 Reporting Unit ("DVRU").    Braskett's claims in this case involve
6 the defendants' contacts with Braskett's wife Barbara Braskett
7 ("Mrs. Braskett"), and the defendants' search of the Brasketts'
8 residence on April 13, 2010.    Braskett asserts a single claim for
9 relief, alleging the defendants' actions on the date in question
10 violated Braskett's "right to be free of unreasonable search and
11 seizure under the Fourth Amendment and 42 USC 1983."    Dkt. #27,
12 Amended Complaint, ¶ 8.

13      The case currently is before the court on the defendants'
14 Motion for Summary Judgment.    Dkt. #30.    The defendants argue they
15 are entitled to judgment as a matter of law on Braskett's claim.
16 The motion has been briefed fully by the parties, and the court
17 heard oral argument on the motion on July 9, 2012.

18
19                     ***BACKGROUND FACTS***
20      The following facts are uncontroverted, unless otherwise
21 noted.

22      Mr. Braskett and Mrs. Braskett jointly purchased their current
23 residence in Vancouver, Washington, and they both are named on the
24 title to the property.[1]    In April 2010, Mrs. Braskett reported
25 verbal abuse by Mr. Braskett to a family friend, who is a former
26
27 _____
28      [1] Declaration of Jennifer Johnston ("Johnston Decl."), Ex. 2,
Deposition of Barbara Braskett, ("B. Braskett Depo.") 48:14-19.

2 - MEMORANDUM OPINION AND ORDER

1  PPB reserve police officer.[2]  On or around April 12 or 13, 2010,
2  Mrs. Braskett asked Mr. Braskett to move out of the family home.
3  Mrs. Braskett remained in the house with their two children.[3]

4       On the night of Monday, April 12, 2010, Detective Celeste
5  Fender and Officer Nathan Tobey went to the Braskett residence to
6  investigate an allegation of domestic violence and prescription
7  drug abuse by Mr. Braskett.[4]  Detective Fender attempted to call
8  the Braskett residence phone and knocked on the door on numerous
9  occasions, but there was no answer to either.[5]

10      On Tuesday, April 13, 2010, Fender and Tobey returned to the
11 Braskett residence to make contact with Mrs. Braskett.  They
12 identified themselves as PPB officers and members of the DVRU,
13 stating they were there to talk to Mrs. Braskett about her husband,
14 Mr. Braskett, and to make sure that Mrs. Braskett and the children
15 were okay.[6]

16      Mrs. Braskett invited Fender and Tobey into her home, and they
17 talked at the kitchen table.[7]  At the time of inviting Fender and
18 Tobey into the Braskett residence, Mrs. Braskett was aware that one

19  _____

20      [2] Ex. 2, B. Braskett Depo. 18:9-19:9.

21      [3] Johnston Decl. Ex. 1, Deposition of Richard Braskett, ("R.
   Braskett Depo.") 31:19-23; Ex. 2, B. Braskett Depo. 69:20-70:24.
22
23      [4] Memo in Supp. of Defs.' Motion Summ. J., at 2.

24      [5] Johnston Decl. Ex. 3, Deposition of Celeste Fender Volumes
   I and II ("Ex. 3, Fender Depo.") 34:18-35:8.
25
26      [6] Ex. 2, B. Braskett Depo. 77:4-22; Ex. 3, Fender Depo. 57:22-
   58-5; Johnston Decl. Ex. 4, Deposition of Nathan Tobey, ("Tobey
27  Depo.") 4:14-18; 6:16-19.

28      [7] Ex. 2, B. Braskett Depo. 77:18-79:6; Ex. 3, Fender Depo.
   58:5-7.

3 - MEMORANDUM OPINION AND ORDER

1  of the subjects about which the officers wanted to talk to her was

2  Mr. Braskett's use of alcohol and other drugs.[8]

3      They talked, at the kitchen table, about the safety of

4  Mrs. Braskett and the children, and about giving Mr. Braskett any

5  assistance that he might need.[9]  Mrs. Braskett was relieved to talk

6  to somebody from the PPB.[10]  She talked about the stress which both

7  she and her husband were under.  Mr. Braskett's stress stemmed from

8  an incident which happened a few years ago.[11]  Mrs. Braskett was

9  concerned that this stress was causing Mr. Braskett to overuse

10  prescription medication.

11      Both Mrs. Braskett and Mr. Braskett had prescriptions for

12  painkiller medication.[12]  Mrs. Braskett thought Mr. Braskett's

13  doctor was prescribing excessive amounts of medication, and when

14  Mr. Braskett's medication ran out, he would take Mrs. Braskett's

15  medication.  Mrs. Braskett was also concerned that Mr. Braskett was

16  consuming more alcohol than usual, and he had become verbally

17  abusive towards her.[13]  Mrs. Braskett began hiding her medication

18  from Mr. Braskett so that he could not take hers.[14]

---

[8] Ex. 2, B. Braskett Depo. 18:2-19:4.

[9] Ex. 2, B. Braskett Depo. 79:7-15.

[10] Ex. 2, B. Braskett Depo. 127:8-15; 130:8-19; Ex. 4, Tobey Depo. 19:2-3.

[11] Ex. 4, Tobey Depo. 18:4-8.

[12] Ex. 4, Tobey Depo. 18:18-19.

[13] Ex. 2, B. Braskett Depo. 79:22-80:14; Ex. 3, Fender Depo. 68:7-11; Ex. 4, Tobey Depo. 18:10-11.

[14] Ex. 2, B. Braskett Depo. 89:14-19; Ex. 4, Tobey Depo. 18:18-22.

4 - MEMORANDUM OPINION AND ORDER

Mrs. Braskett clearly stated that while Mr. Braskett had become increasingly verbally abusive towards her, he had never been physically violent towards her or the children.[15] Mrs. Braskett said the situation had been causing her stress, and she had been seeking help for some time.[16]

In April 2010, Mrs. Braskett was teaching the fourth grade, and one of her students had thrown a chair at her, which caused her additional stress.[17] Mrs. Braskett told Fender and Tobey about the incident, and that she was taking sleeping pills as a result of the stress it had caused her.[18] Mrs. Braskett also had a painful shoulder injury at the time, and so she was taking a pain reliever/sleeping agent.[19]

Tobey does not recall Mrs. Braskett talking about incidents in her classroom, but does recall Mrs. Braskett informing the officers that she had taken sleeping pills the night before, and that was why she had not answered the door.[20]

Mrs. Braskett recalls Fender and Tobey specifically asking whether there were any firearms in the house.[21]   Mrs. Braskett

---

[15] Ex. 2, B. Braskett Depo. 79:16-21; Ex. 3, Fender Depo. 61:21-62:1; Ex. 4, Tobey Depo. 8:10-13.

[16] Ex. 2, B. Braskett Depo. 82:14-20; Ex. 4, Tobey Depo. 18:23-19:3.

[17] Ex. 2, B. Braskett Depo. 33:4-20.

[18] Declaration of Kevin Keaney ("Keaney Decl.") Ex. 1, B. Braskett Depo., ECF p. 38.

[19] Keaney Decl., Ex. 1, B. Braskett Depo. ECF p. 40.

[20] Ex. 4, Tobey Depo. 19:4-17.

[21] Ex. 2, B. Braskett Depo. 95:16-96:23.

5 - MEMORANDUM OPINION AND ORDER

communicated her concerns about Mr. Braskett's firearms around the
house, as their children might be able to access them, and she
asked Fender and Tobey to secure the firearms.[22]  Mrs. Braskett led
Fender and Tobey to the master bedroom, informed Fender and Tobey
that Mr. Braskett kept a gun in the dresser, and asked them to
remove the gun.  Tobey removed the gun.[23]  Tobey assumed that
Mrs. Braskett had access to the dresser.[24]  Mrs. Braskett allowed
Tobey to unload the ammunition from the gun.[25]  Fender did not enter
the dresser to remove the gun, and did not touch the gun at any
stage.[26]

Mrs. Braskett did not want the gun in the house, so she opened
a combination lock gun safe in the garage.  Officer Tobey placed
the gun in the gun safe at Mrs. Braskett's request.[27]

Mrs. Braskett was concerned about the light on the front porch
not working, so Fender and Tobey went to a nearby store and pur-
chased a new light bulb.  Tobey installed the new light bulb.[28]

---

[22] Ex. 3, Fender Depo. 72:13-16; 75:20-22.

[23] Ex. 2, B. Braskett Depo. 97:7-13; Ex. 4, Tobey Depo. 23:20-24:5.

[24] Ex. 4, Tobey Depo. 27:8-28:6.

[25] Ex. 2, B. Braskett Depo. 97:11-16; 156:10-12; Ex. 3, Fender Depo. 73:1-4.

[26] Declaration of Celeste Fender ¶3 ("Fender Decl."); Ex. 3, Fender Depo. 72:12-21; 73:13-20; 79:7-12.

[27] Ex. 2, B. Braskett Depo 97:17-98:2; Ex. 3, Fender Depo 73:13-15; Ex. 4, Tobey Depo 24:13-14.

[28] Keaney Decl. Ex. 1, B. Braskett Depo. 95:2-11; Ex. 4, Tobey Depo. 32:10-19.

6 - MEMORANDUM OPINION AND ORDER

1    Mrs. Braskett claims she was assured on numerous occasions
2  that the information which she imparted to Fender and Tobey would
3  remain confidential between the three of them.  Mrs. Braskett was
4  aware that Fender and Tobey were from the DVRU; however, she
5  believed their conversations would remain confidential because
6  there was no allegation of physical abuse by Mr. Braskett towards
7  Mrs. Braskett or their children.[29]  Tobey does not remember
8  Mrs. Braskett asking whether their conversation would remain
9  confidential.[30]

10    According to Fender, she called Mrs. Braskett on April 14,
11 2010, informing her that the PPB wanted to ensure Mr. Braskett had
12 his own prescription, and they arranged for Fender and Tobey to go
13 to the house after Mrs. Braskett finished work.[31]  Mrs. Braskett
14 does not recall any such phone call.[32]  Fender and Tobey arrived at
15 the Braskett residence shortly after 4:00 p.m.[33]  When Mrs. Braskett
16 arrived home from work with her children, she invited Fender and
17 Tobey inside the Braskett residence.[34]

18 / / /

19 / / /

20

21      [29] Ex. 2, B. Braskett Depo. 127:16-22; Keaney Decl. Ex. 1, B.
22 Braskett Depo. 127:16-129:24 (ECF pp. 33-34).

23      [30] Ex. 4, Tobey Depo. 19:22-24.

24      [31] Ex. 3, Fender Depo. 98:23-99:23.

25      [32] Ex. 2, B. Braskett Depo. 98:22-25.

26      [33] Ex. 3, Fender Depo. 101:5-12; Ex. 4, Tobey Depo. 34:18-22.

27      [34] Ex. 2, B. Braskett Depo. 100:4-5; Ex. 3, Fender Depo. 101:5-
28 22; Ex. 4, Tobey Depo. 34:22-24.

1    Mrs. Braskett went upstairs to retrieve one of Mr. Braskett's
2  medication bottles.[35]  Mrs. Braskett returned upset, and informed
3  Fender and Tobey that Mr. Braskett had been in the house during the
4  day, and had cleaned up and disposed of some prescription medica-
5  tion bottles, even though Mrs. Braskett had asked Mr. Braskett not
6  to enter the house.[36]

7    Mrs. Braskett obtained prescription bottles[37] from
8  Mr. Braskett's medicine cabinet in the master bathroom and showed
9  them to Fender.  Fender copied information from the label onto a
10 piece of paper, but she did not remove the prescription bottles
11 that came from the medicine cabinet from the Braskett residence.[38]
12 Mr. Braskett's prescription Vicodin bottle was not in the medicine
13 cabinet, and so was not part of the bottles which Mrs. Braskett
14 retrieved from that location and showed to Fender.[39]  Neither Fender
15 nor Tobey entered the master bedroom or en-suite bathroom on
16 April 14, 2010.[40]

17    Mrs. Braskett determined that Mr. Braskett had cleaned up
18 because she knew one of Mr. Braskett's empty prescription bottles

19

20

21    [35] Ex. 3 Fender Depo. 102:10-11; Ex. 4 Tobey Depo. 35:3-10.

22    [36] Ex. 3 Fender Depo. 102:14-19: Ex. 4 Tobey Depo. 35:2-10,
23 41:8-10.

24    [37] For the purposes of clarity, "prescription bottles" refers
   exclusively to Mr. Braskett's medication bottles.

25
26    [38] Ex. 2, B. Braskett Depo. 101:8-102:2; 103:16-104:4.

27    [39] Ex. 2, B. Braskett Depo. 106:25-107:2.

28    [40] Ex. 2, B. Braskett Depo. 101:14-24; Declaration of Nathan
   Tobey ("Tobey Decl.") ¶¶ 3-6; Fender Decl. ¶ 4.

8 - MEMORANDUM OPINION AND ORDER

had been in the computer room, but was no longer there, and the wastebasket[41] in the computer room had been emptied.[42]

The garbage had been picked up on that day, and either Mrs. Braskett or her son had brought the garbage can from the street back to the garage earlier that afternoon.[43]  Mrs. Braskett discovered that there was still something in the garbage can, either when her son retrieved the garbage can from the street and Mrs. Braskett closed the lid, when she was retrieving the garbage can from the street herself she realized there was still garbage inside the garbage can, or when she realized the wastebasket in the computer room had been emptied.[44]

Mrs. Braskett led Fender and Tobey to the garage to check the garbage can for medication bottles which had been put in the garbage can that day.[45]  According to Tobey, Mrs. Braskett opened the lid to the garbage can.[46]  Fender does not recall who opened the garbage can.[47]  The garbage can contained a clear plastic garbage

---

[41] For the purposes of clarity, "wastebasket" refers exclusively to the one in the computer room.

[42] Ex. 2, B. Braskett Depo. 106:16-24; 159:13-19.

[43] For the purposes of clarity, "garbage can" refers exclusively to the household garbage can. (Mrs. Braskett describes it as a "big blue thing, with a lid on wheels." Ex. 2, B. Braskett Depo. 102:17.)  It is placed at the curb for periodic pickup by the garbage service.

[44] Ex. 2, B. Braskett Depo. 102:4-21; 104:5-105:24; 106:7-107:60; 159:13-19.

[45] Ex. 4, Tobey Depo. 42:1-6.

[46] Ex. 4, Tobey Depo. 35:14-19.

[47] Ex. 3, Fender Depo. 103:22-104:1.

9 - MEMORANDUM OPINION AND ORDER

1 bag, and one could clearly see that it contained Vicodin bottles.[48]
2 Mrs. Braskett said the bag contained what Mr. Braskett had cleaned
3 up during the day.[49]

4     Mrs. Braskett offered to get an umbrella with a hook so that
5 she could retrieve the garbage bag.[50]  Fender did not retrieve the
6 bag.[51]  Tobey does not remember who removed the bag from the garbage
7 can, but believes that Mrs. Braskett opened the garbage bag and
8 handed the bottles to Fender.[52]  Mrs. Braskett recalls Tobey
9 reaching into the garbage can, removing the bag of prescription
10 bottles from the garbage can, opening the bag, and removing the
11 prescription bottles from the bag.[53]

12     Fender does not recall whether she physically handled the
13 bottles at the Braskett residence, but when Fender and Tobey left
14 the Braskett residence, they took the empty medication bottles with
15 them.[54]

16 / / /
17 / / /
18 / / /

19 

20    [48] Ex. 2, B. Braskett Depo. 159:21-24; Ex. 3, Fender Depo.
21 103:14-21; Ex. 4, Tobey Depo. 35:14-19.

22    [49] Ex. 4, Tobey Depo. 35:18-19.

23    [50] Ex. 2, B. Braskett Depo. 160:4-22.

24    [51] Ex. 3, Fender Depo. 103:24-104:1.

25    [52] Ex. 4, Tobey Depo. 35:14-17; 36:17-22; 42:20-43:3; 49:25-
26 50:2.

27    [53] Ex. 2, B. Braskett Depo. 107:12-20; 159:25-160-22.

28    [54] Ex. 3, Fender Depo. 104:9-13.

10 - MEMORANDUM OPINION AND ORDER

### *SUMMARY JUDGMENT STANDARDS*

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2). In considering a motion for summary judgment, the court "must not weigh the evidence or determine the truth of the matter but only determine whether there is a genuine issue for trial." *Playboy Enters., Inc. v. Welles*, 279 F.3d 796, 800 (9th Cir. 2002) (citing *Abdul-Jabbar v. General Motors Corp.*, 85 F.3d 407, 410 (9th Cir. 1996)). The Ninth Circuit Court of Appeals has described "the shifting burden of proof governing motions for summary judgment" as follows:

> The moving party initially bears the burden of proving the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). Where the non-moving party bears the burden of proof at trial, the moving party need only prove that there is an absence of evidence to support the non-moving party's case. *Id.* at 325, 106 S. Ct. 2548. Where the moving party meets that burden, the burden then shifts to the non-moving party to designate specific facts demonstrating the existence of genuine issues for trial. *Id.* at 324, 106 S. Ct. 2548. This burden is not a light one. The non-moving party must show more than the mere existence of a scintilla of evidence. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). The non-moving party must do more than show there is some "metaphysical doubt" as to the material facts at issue. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S. Ct. 1348, 89 L. Ed. 2d 528 (1986). In fact, the non-moving party must come forth with evidence from which a jury could reasonably render a verdict in the non-moving party's favor. *Anderson*, 477 U.S. at 252, 106 S. Ct. 2505. In determining whether a jury could reasonably render a verdict in the non-moving party's favor, all justifiable inferences are to be

1    drawn in its favor.  *Id.* at 255, 106 S. Ct.
2    2505.

3   *In re Oracle Corp. Securities Litigation*, 627 F.3d 376, 387 (9th
4   Cir. 2010).

5

6                        ***DISCUSSION***

7        In the Amended Complaint, Braskett brings this 42 U.S.C.
8   § 1983 claim alleging the defendants breached his Fourth Amendment
9   rights by entering the Braskett residence without his consent, and
10  conducting a search without a warrant or exigent circumstances.
11  Specifically, Braskett contends that in the course of the search,
12  the defendants violated his Fourth Amendment rights by searching
13  his medicine cabinet, taking medical records, going through the
14  garbage, and retrieving a handgun from the dresser.[55]  In the face
15  of the defendants' assertion that Mrs. Braskett consented to the
16  search, Mr. Braskett contends that, at the time, Mrs. Braskett did
17  not have the capacity to consent.

18       In addition, the defendants claim that even if Braskett could
19  show his constitutional rights were violated, the defendants are
20  entitled to summary judgment because qualified immunity shields
21  them from liability.  The defendants seek summary judgment on all
22  of Mr. Braskett's claims.

23

24              **Burden of Proving Incapacity**

25       The parties dispute whether the burden of proving
26  Mrs. Braskett's capacity to consent to a search falls upon the

27  _____

28       [55] Johnston Decl., Ex. 1, R. Braskett Depo. 34:8-15.

12 - MEMORANDUM OPINION AND ORDER

1 defendants, as the state actors, or must be carried by
2 Mr. Braskett, as the civil plaintiff.  Mr. Braskett challenges the
3 officers' reliance on Mrs. Braskett's consent, claiming she was too
4 tired and too stressed to be able to make a voluntary decision to
5 consent.   He makes this argument with respect to each alleged
6 constitutional violation.

7      Mr. Braskett alleges the government always has the burden of
8 proving the existence of consent, citing *United States v. Shaibu*,
9 920 F.2d 1423, 1426 (9th Cir. 1990).[56]  The defendants respond that
10 *Shaibu* is a criminal case, and is inapplicable to this § 1983
11 claim.[57]  The defendants allege Mr. Braskett carries the burden of
12 proving lack of consent, citing Ninth Circuit authority.

13                    [In] a criminal case, the government bears the
                      burden of proving by a preponderance of the
14                    evidence that consent was freely and volun-
                      tarily given.  In a civil case under 42 U.S.C.
15                    1983, however, the plaintiff carries the ulti-
                      mate burden of establishing each element of
16                    his or her claim, including lack of consent.

17 *Pavao v. Pagay*, 307 F.3d 915, 918-19 (9th Cir. 2002).

18      In *Larez v. Holcomb*, 16 F.3d 1513 (9th Cir. 1994), the
19 plaintiff brought a § 1983 action against police officers for
20 wrongful detention.  Larez was seized by officers and detained for
21 questioning in connection with a murder investigation in which her
22 brother was a suspect.  Larez claimed she thought she was under
23 arrest; she was taken to the police station and held, in handcuffs,
24 for two hours; and she neither consented to be questioned, nor
25 responded to officers' questions.  The officers told a different

26

27      [56] Pl.'s Opp'n to Defs.' Mot. Summ. J., at 8.

28      [57] Reply in Supp. of Defs.' Mot. for Summ. J., at 5.

13 - MEMORANDUM OPINION AND ORDER

story, claiming Larez was cooperative from the beginning; she consented to being taken to the police station for questioning; and she never was handcuffed.  The court held that while the burden of producing evidence of consent may be placed on the defendant, the risk of nonpersuasion remains with the plaintiff, who always has the burden to prove a violation of the Fourth Amendment.  *Larez*, 16 F.3d at 1517 (citing *Ruggiero v. Krzeminski*, 928 F.2d 558, 563 (2d Cir. 1991)).  *See also, e.g., Bogan v. City of Chicago*, 644 F.3d 563, 570 (7th Cir. 2011) (employing a "criminal burden of proof is contrary to established principles governing civil trials, namely, that 'the ultimate risk of nonpersuasion must remain squarely on the plaintiff'") (citations omitted); *Valance v. Wisel*, 110 F.3d 1269, 1279 (7th Cir. 1997) (in a civil case, defendant must offer evidence to meet or rebut the presumption that a warrantless search is unreasonable, but plaintiff must prove consent was not given or was invalid) (citing, *inter alia*, Fed. R. Evid. 301).

While *Larez* was a § 1983 case, that court did not consider the issue of a third party's consent.  Having examined the case law surrounding § 1983 claims, it would appear that the issues arising in this case are somewhat unique.  Neither counsel for the plaintiff, nor the defendants, has made known to the court any case which concerned a § 1983 claim alleging a violation of the Fourth Amendment, where the plaintiff challenged the capacity of a third party to consent, after the § 1983 defendants relied on that third party's consent to justify their search.  I note the defendants here plead the consent of Mrs. Braskett as an affirmative defense to avoid the § 1983 claim of a constitutional violation.  *See* Fed. R. Civ. P. 8(c)(1) (requiring a party to state a matter of

14 - MEMORANDUM OPINION AND ORDER

1  avoidance as an affirmative defense).   On these facts, it seems
2  appropriate that Braskett must prove he did not consent to any
3  search, but if the defendants want to avoid a constitutional
4  violation by relying on Mrs. Braskett's consent, they should have
5  the burden of proving its validity.  However, resolution of who has
6  this burden is not essential in deciding this motion for summary
7  judgment.  To avoid summary judgment, Braskett is required to raise
8  a material question of fact about the capacity of Mrs. Braskett to
9  consent to a search of the Braskett residence.  I turn to that
10 issue.

11     "[W]hether a consent to a search was in fact 'voluntary' or
12 was the product of duress or coercion, express or implied, is a
13 question of fact to be determined from the totality of all the
14 circumstances."  *United States v. Garcia*, 997 F.2d 1273, 1281-82
15 (9th Cir. 1993) (citing *Schneckloth v. Bustamonte*, 412 U.S. 218,
16 226-27, 93 S. Ct. 2041, 2047-28, 36 L. Ed. 2d 854 (1973)).  Both
17 parties agree that this holistic standard is the proper test in the
18 instant case.[58]  Braskett claims that all of the factors weighing
19 upon Mrs. Braskett on the night of April 13, 2010, made her
20 incapable of consenting.   The defendants assert the factors
21 weighing upon Mrs. Braskett that night were not sufficiently
22 incapacitating so as to prevent her from consenting to a search of
23 the Braskett residence.

24     The defendants cite numerous cases concerning the threshold
25 for a finding of incapacity to consent.  The cases set the bar
26
27 _____
28     [58] Reply in Supp. Defs.' Mot. Summ. J., at 10; Pl.'s Opp'n to
   Defs.' Mot. Summ. J., at 8.

15 - MEMORANDUM OPINION AND ORDER

quite high for a finding of incapacity.   In *United States v. George*, 987 F.2d 1428 (9th Cir. 1993), the defendant had overdosed on heroin, and was questioned by police several hours later, while he was still in critical condition.   The court held the defendant's consent for officers to search his hotel room was voluntary, finding his condition "did not render him unconscious or comatose," and his consent was not coerced by the police.   *George*, 987 F.2d at 1430. Similarly, in *United States v. Martin*, 781 F.2d 671 (9th Cir. 1985), the defendant was questioned by police in the hospital, while he was under the influence of pain medication.   The court held the defendant's consent to search was voluntary:

> Martin was awake and relatively coherent during the questioning at the hospital. . . . There is no evidence of extended and oppressive questioning.   Nor had Martin received excessive quantities or unusual combinations of drugs.   Martin's injuries, while painful, did not render him unconscious or comatose. Moreover, Martin said that he wanted to talk to the officers and was not reluctant to tell his story.

*Martin*, 781 F.2d at 674.

In *United States v. Freyre-Lazero*, 3 F.3d 1496 (11th Cir. 1993), involving a factual situation similar to the one in the case at hand, the defendant alleged his wife was unable to consent to a search of the defendant's home because she was emotionally distraught after having seen her son being arrested earlier that day.   The court affirmed the district court's finding that the wife was capable of consenting, noting she had a "rational demeanor," and although she had witnessed her son's arrest, "both detectives testified that she was not too distraught to comprehend the implications of the search." *Freyre-Lazero*, 3 F.3d at 1501.   *See*

16 - MEMORANDUM OPINION AND ORDER

1 *also United States v. Mancias*, 350 F.3d 800, 805-06 (8th Cir. 2003)

2 (defendant's extreme fatigue did not render his consent

3 involuntary); *United States v. Duran*, 957 F.2d 499, 503 (7th Cir.

4 1992) ("[T]he fact that a consenting party is extremely upset at

5 the time she consents is not dispositive. . . . [A]bsent a showing

6 that her emotional distress was so profound as to impair her

7 capacity for self-determination or understanding of what the police

8 were seeking, it is not enough to tip the balance towards finding

9 that her consent was involuntary.").

10      Examining all of the factors in the instant case, the record

11 does not reflect circumstances or factors which caused

12 Mrs. Braskett to be incapable of consenting.   In April 2010,

13 Mrs. Braskett was an elementary school teacher, and was capable of

14 attending work, driving her car, and caring for her children.[59]   She

15 expressed concerns about her husband's alleged use of alcohol and

16 other drugs, and other stressors in their lives.   When asked

17 whether there were any guns in the house, Mrs. Braskett not only

18 recalled that there was a gun and its location, she led the

19 defendants to the gun, and asked them to unload it and to place it

20 in the gun safe.   She then took the defendants to the garage and

21 unlocked the gun safe.   These are not the actions of an incoherent

22 or markedly impaired individual.   They raise no issue about her

23 capacity to consent.

24      There is no evidence here of extended or oppressive

25 questioning.   Other evidence shows Mrs. Braskett was capable of

---

28      [59] Ex. 2, B. Braskett Depo. 70:21-22; Ex. 3, Fender Depo.
101:11-22.

17 - MEMORANDUM OPINION AND ORDER

1 rational decision-making.  She told the officers she had taken
2 Tylenol PM, a painkiller with a sleeping agent, because she did not
3 want to mix Motrin, which she was taking for her injured shoulder,
4 with a regular sleeping agent.[60]  I find that while Mrs. Braskett
5 had a painful shoulder injury at the time, and was under some
6 degree of stress due to other events in her life, no reasonable
7 juror could find, on these facts, that Mrs. Braskett did not
8 voluntarily consent to the "searches," given the standards for that
9 analysis in the Ninth Circuit.  Regardless of who has the burden of
10 persuasion on the issue of Mrs. Braskett's capacity to consent,
11 Mr. Braskett has not shown the existence of a material issue of
12 fact in that regard.

13

14 **Ruse**

15    Mr. Braskett further alleges that Fender and Tobey obtained
16 entry into the Braskett residence through a lie.  Mr. Braskett
17 claims Fender and Tobey went to the Braskett residence and told
18 Mrs. Braskett they were there to talk about her safety when, in
19 fact, they were there to conduct a criminal investigation into
20 Mr. Braskett's use of drugs.  As such, Mr. Braskett claims that
21 before Mrs. Braskett invited Fender and Tobey into the house, they
22 lied about the purpose of their visit.  Mr. Braskett argues this
23 was impermissible.  During oral argument, Mr. Braskett's counsel
24 cited the recent case of *Cohen v. Boyle*, slip op., 2012 WL 1292431
25 (W.D. Wash. Apr. 16, 2012), for the proposition that although
26 officers may use a ruse to gain entry to a residence in some

27

28    [60] Keaney Decl., Ex. 1, B. Braskett Dep, ECF p. 40.

18 - MEMORANDUM OPINION AND ORDER

circumstances, it is impermissible for officers to gain entry into
a residence by "'misrepresenting the scope, nature or purpose of a
government investigation.'" *Cohen*, 2012 WL 1292431 at *9 (quoting
*United States v. Bosse*, 898 F.2d 113, 115 (9th Cir. 1990)).[61]

      *Cohen*, itself, is not on point here, and *Bosse* and other Ninth
Circuit precedents cited by the *Cohen* court would actually support
the defendants' position - if, in fact, they had employed a ruse to
gain entry into the residence.   However, I find no ruse was
employed.   The record indicates that at the time Mrs. Braskett
invited Fender and Tobey into the residence on April 13, 2010, she
was aware that one of the subjects about which the officers wanted
to talk to her was the safety of her and her children.   The only
"search" on that date involved Mr. Braskett's gun.   On April 14,
2010, Mrs. Braskett was aware the officers were there regarding
prescription pill bottles.   She went looking for them.   Those were
the   only   items   involved   in   the   "searches"   on   the   14th.
Mrs. Braskett concedes she knew, in April 2010, that the officers
were at the house regarding Mr. Braskett's use of prescription
medications.   She knew that on either the 13th, or the 14th, or
both.   Because she knew it at least by the 14th, there was no ruse.
I find Mrs. Braskett voluntarily consented to the officers' entry
into the residence on both dates.   She was not impermissibly misled
by their statements regarding why they were there.   The searches
were not unconstitutional on this basis.

/ / /

/ / /

---

    [61] *See* Oral Argument Tr., July 9, 2012, at 50:13-51:4.

19 - MEMORANDUM OPINION AND ORDER

1                    **42 U.S.C. § 1983 Violations**

2        Section 1983 provides, in relevant part, that "[e]very person
3   who, under color of any statute, ordinance, regulation, custom, or
4   usage, of any State . . . subjects, or causes to be subjected, any
5   citizen of the United States or other person within the
6   jurisdiction thereof to the deprivation of any rights, privileges,
7   or immunities secured by the Constitution and laws, shall be liable
8   to the party injured in an action at law, suit in equity, or other
9   proper proceeding for redress."

10       A plaintiff raising a 42 U.S.C. § 1983 claim must show that a
11  person acting under color of state law deprived him of a
12  constitutional right. *Dowe v. Total Action Against Poverty*, 145
13  F.3d 653, 658 (4th Cir. 1998).  Section 1983 "is not itself a
14  source of substantive rights, but merely provides a method for
15  vindicating federal rights elsewhere conferred.  The first step in
16  any such claim is to identify the specific constitutional right
17  allegedly infringed." *Albright v. Oliver*, 510 U.S. 266, 114 S. Ct.
18  807, 811-812, 127 L. Ed. 2d 114 (1994) (internal citations and
19  quotation marks omitted).

20

21                    **Fourth Amendment Violations**

22       The Fourth Amendment provides that "the right of the people to
23  be secure in their persons, houses, papers, and effects, against
24  unreasonable searches and seizures, shall not be violated. . . ."
25  U.S. Const. Amend. IV.

26       The Fourth Amendment is violated when a search is conducted
27  without a warrant issued upon probable cause.  A warrantless search
28  is "per se unreasonable. . . subject only to a few specifically

20 - MEMORANDUM OPINION AND ORDER

1  established and well-delineated exceptions." *Schneckloth v.*
2  *Bustamonte*, 412 U.S. 218, 219, 93 S. Ct. 2041, 2043, 36 L. Ed. 2d
3  854 (1973).

4      "The prohibition does not apply, however, to situations in
5  which voluntary consent has been obtained, either from the
6  individual whose property is searched, or from a third party who
7  possesses common authority over the premises." *Illinois v.*
8  *Rodriguez* 497 U.S. 177, 181, 110 S. Ct. 2793, 2797, 111 L. Ed. 2d
9  148 (1990)(internal citations omitted).

10          Common authority is, of course, not to be
            implied from the mere property interest a
11          third party has in the property.   The
            authority which justifies the third-party
12          consent does not rest upon the law of
            property, with its attendant historical and
13          legal refinements but rests rather on mutual
            use of the property by persons generally
14          having joint access or control for most
            purposes, so that it is reasonable to
15          recognize that any of the co-inhabitants has
            the right to permit the inspection in his own
16          right and that the others have assumed the
            risk that one of their number might permit the
17          common area to be searched.

18  *United States v. Matlock*, 415 U.S. 164, 171 n.7, 94 S. Ct. 988, 993
19  n.7, 39 L. Ed. 2d 242(1974) (internal citations omitted).

20      In a § 1983 claim such as this, to avoid summary judgment, a
21  plaintiff must raise a material issue of fact regarding whether the
22  person giving consent had common authority over the area searched.
23  The *Matlock* Court held that "the consent of one who possesses
24  common authority over premises or effects is valid as against the
25  absent, nonconsenting person with whom that authority is shared."
26  *Matlock*, 415 U.S. at 170, 94 S. Ct. at 993.

27      The Ninth Circuit has summarized post-*Matlock* cases as
28  requiring that "a consent-giver with limited access to the searched

21 - MEMORANDUM OPINION AND ORDER

property lacks actual authority to consent to a search. . . .  The cases upholding searches generally rely on the consent-giver's unlimited access to property to sustain the search." *U.S. v. Kim*, 105 F.3d 1579, 1582 (9th Cir. 1997).

The Ninth Circuit has upheld a spouse's authority to consent to police entering a property in which both she and the defendant lived as co-tenants, finding the consent-giver was a joint-user of the property, with full access to the property, and as such, could consent to the police searching the property. *United States v. Guzman*, 852 F.2d 1117, 1121 (9th Cir. 1988).  In *United States v. Sealey* 830 F.2d 1028 (9th Cir. 1987), the defendant's spouse consented to police searching the property.  The Ninth Circuit found the defendant's wife had mutual access to the entire property, she was part owner of the residence, she was married to the defendant, and she had full access to all parts of the residence.  The defendant asserted that he retained sole ownership over sealed containers, to the exclusion of his wife.  However, the Ninth Circuit rejected this assertion because, on the facts, the defendant had failed to mark the containers in such a way as to indicate his sole ownership.

## Analysis

In this case, Braskett claims the defendants entered his home, conducted a search with neither a warrant nor exigent circumstances, and removed property from the Braskett residence, all without his consent.  Braskett alleges these actions violated his right to be free from "unreasonable search and seizure under the

22 - MEMORANDUM OPINION AND ORDER

1   Fourth Amendment."[62]   Specifically, Braskett contends that in the
2   course of the search, the defendants violated his Fourth Amendment
3   rights by searching his medicine cabinet, taking medical records,
4   going through the garbage, and retrieving a handgun from the
5   dresser.   Braskett contends that at the time, Mrs. Braskett was
6   incapable of consenting.

7       On or around April 12, 2010, Mrs. Braskett asked Mr. Braskett
8   to move out of the family home.   Mrs. Braskett remained in the
9   house with their two children.[63]  On Tuesday, April 13, 2010, Fender
10  and Tobey went to the Braskett residence, identified themselves to
11  Mrs. Braskett as members of the PPB, and talked with Mrs. Braskett
12  at the kitchen table.[64]

13      Mr. and Mrs. Braskett are both on the title to the property.
14  They both had unfettered access to the entire house.   Neither of
15  them, on this record, had ever physically or verbally excluded the
16  other from an area within the house.[65]   In fact, on the dates in
17  question, there is no material issue of fact that Mrs. Braskett had
18  "common authority" over all areas of the residence, and thus was
19  able to validly consent to the defendants' search of the residence.
20  / / /
21  / / /

22
23      [62] First Amend. Comp. ¶¶ 7 & 8.

24      [63] Ex. 1, R. Braskett Depo. 31:19-23; Ex. 2, B. Braskett Depo.
25  69:20-70:24.

26      [64] Ex. 3, Fender Depo. 58:5-7; Ex. 2, B. Braskett Depo. 77:18-
27  79:6.

28      [65] Ex. 1, R. Braskett Depo. 70:1-8; 81:2-5; Ex. 2, B. Braskett
    Depo. 110:13-16; 111:5-8.

23 - MEMORANDUM OPINION AND ORDER

I.    *Removal of gun from master bedroom dresser*

While sitting at the kitchen table on April 13, 2010, Mrs. Braskett expressed her concern about Mr. Braskett's firearms around the house, and the danger they posed should their children gain access to them.[66]  Mrs. Braskett led Fender and Tobey to the master bedroom, informed them that Mr. Braskett had a gun in the dresser, and asked them to remove the gun. Tobey entered the bedroom and removed the gun.[67]  Fender did not enter the dresser to remove the gun, and did not touch the gun at any stage.[68]  Tobey assumed that Mrs. Braskett had access to the dresser.[69] Mrs. Braskett allowed Tobey to unload the ammunition from the gun.[70] Mrs. Braskett opened the gun safe in the garage.  The gun safe had a touchpad lock to which Mrs. Braskett knew the combination.[71] Tobey placed the gun in the safe in the garage because Mrs. Braskett did not want the gun in the house.[72]  Neither Fender nor Tobey removed the firearm from the Braskett residence at any time.

---

[66] Ex. 3, Fender Depo. 72:13-16; 75:20-22.

[67] Ex. 2, B. Braskett Depo. 97:7-13; Ex. 4, Tobey Depo. 23:20-24:5.

[68] Fender Decl. ¶3; Ex. 3, Fender Depo. 72:12-21; 73:13-20; 79:7-12.

[69] Ex. 4, Tobey Depo. 27:8-28:6.

[70] Ex. 2, B. Braskett Depo. 97:11-16; 156:10-12; Ex. 3, Fender Depo. 73:1-4.

[71] Ex. 2, B. Braskett Depo. 97:11-24.

[72] Ex. 2, B. Braskett Depo. 97:25-98:2; Ex. 4 Tobey Decl. 24:13-14.

24 - MEMORANDUM OPINION AND ORDER

1    The defendants allege that Fender is entitled to summary
2  judgment because she, unlike Tobey, did not touch the gun at any
3  point.[73] One of the reasons Fender and Tobey went to the Braskett
4  residence was to ensure that Mrs. Braskett and her children were
5  safe.[74]  The removal of the gun from the master bedroom dresser, and
6  its subsequent placement in the gun safe, was in line with the
7  purpose of ensuring the safety of Mrs. Braskett and her children.
8  Both officers were at the residence inquiring about Mrs. Braskett's
9  safety.  It would be an artificial distinction, and contrary to
10 Fender's announced purpose for being there, to find that Fender was
11 not involved in the removal of the gun from the master bedroom
12 dresser.  She was present in the Braskett residence when Tobey
13 moved the gun to ensure the safety of Mrs. Braskett and her
14 children.  Both officers were involved in the safety conversation.

15    However, there are no issues of material fact with respect to
16 the gun.  Mrs. Braskett had common authority over the entire
17 Braskett residence.  She knew the gun was in the dresser, and knew
18 the combination code for the gun safe.  This is consistent with her
19 having "common authority" over at least those areas associated with
20 the guns in the house.  Tobey only entered the dresser at the
21 request of and with the consent of Mrs. Braskett.  The defendants
22 are entitled to summary judgment with respect to the gun because
23 the "search," which defendant does not contest for purposes of this
24 motion, was done with appropriate consent.

25

26    [73] Memo in Supp. of Defs.' Motion Summ. J., 14.

27    [74] Ex. 2, B. Braskett Depo. 77:13-17; Ex. 4, Tobey Depo. 12:20-
28 25.

25 - MEMORANDUM OPINION AND ORDER

*II.   Search of the medicine cabinet*

On April 14, 2010, Fender and Tobey returned to the Braskett residence to determine whether Mr. Braskett had his own prescription for painkiller medication.[75]  Mrs. Braskett arrived home from work, and invited Fender and Tobey inside the Braskett residence.[76]  Mrs. Braskett went upstairs to retrieve one of Mr. Braskett's medication bottles, but she was unable to find one initially because Mr. Braskett had been in the house and gotten rid of them.[77]  Mrs. Braskett obtained prescription bottles from her husband's medicine cabinet in the master bathroom and showed them to Fender, who wrote information from the labels on a piece of paper, but did not remove the bottles from the Braskett residence.[78]   Neither Fender nor Tobey ever went into either the medicine cabinet or the master bathroom on April 14, 2010.[79]

The record illustrates that there was no part of the Braskett residence from which either spouse was excluded.  *Matlock* made the point that common authority is not derived from a proprietary interest, but rather is based upon the mutual use of the property such that "it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right

---

[75] Tobey Depo. 34:18-22; Ex. 3, Fender Depo. 101:5-12.

[76] Ex. 3, Fender Depo. 101:5-22; Ex. 4, Tobey Depo. 34:22-24; Ex. 2, B. Braskett Depo. 100:4-5.

[77] Ex. 3, Fender Depo. 102:8-19; Ex. 4, Tobey Depo. 35:3-10.

[78] Ex. 2, B. Braskett Depo. 101:8-102:2; 103: 16-104:4.

[79] Ex. 2, B. Braskett Depo, 101:8-25; Ex. 3, Fender Depo. 133:15-21; Tobey Decl. ¶6; Fender Decl. ¶4.

1  and that the others have assumed the risk that one of their number
2  might permit the common area to be searched." *Matlock*, 415 U.S. at
3  171 n.7, 94 S. Ct. at 993 n.7.

4      Braskett claims that when he left his medication in the
5  bathroom, he had a reasonable expectation of privacy, as he did not
6  expect the PPB to come to his home.[80]  The Ninth Circuit considered
7  the scope of the mutual use doctrine in *United States v. Welch*, 4
8  F.3d. 761 (9th Cir. 1993).  There, McGee and Welch rented a car and
9  drove to Las Vegas.  Both were subsequently arrested.  McGee
10 consented to a search of the car.  The Ninth Circuit upheld the
11 search of the car because both McGee and Welch had joint access to
12 and mutual use of it, and "by sharing access to and use of the car
13 with McGee, Welch relinquished, in part, her expectation of privacy
14 in Fourth Amendment interests in the car." *Welch*, 4 F.3d at 764.
15 However, the court found Welch did not relinquish her expectation
16 of privacy in her purse which was in the car.  *Id.*  "The shared
17 control of 'host' property does not serve to forfeit the expecta-
18 tion of privacy in containers within that property." *Id.* (internal
19 citations and quotation marks omitted).

20     When applied to the instant case, Mr. Braskett apparently
21 contends that, irrespective of Mrs. Braskett's authority over the
22 master bathroom and medicine cabinet (i.e., the "host property"),
23 Mr. Braskett had not necessarily forfeited an expectation of
24 privacy in the medical records contained therein.[81]  Mr. Braskett
25 considers each of the prescription bottles to constitute a

26 ────────────────

27     [80] Oral Arg. Tr., July 9, 2012, at 56:21-57:9.

28     [81] Ex. 1, R. Braskett Depo. 72:16-20.

27 - MEMORANDUM OPINION AND ORDER

confidential medical record.[82]   Here, Mr. Braskett fails to substantiate his claim that he had retained a reasonable expecta-tion of privacy in the medical information contained on his prescription bottles.   Rather, than storing his prescription bottles exclusively in his medicine cabinet, Mr. Braskett concedes that, on occasion, he left his prescription bottles around the house.[83]   When Mr. Braskett disposed of his prescription bottles, he did nothing to destroy the "confidential medical records" contained on those bottles.[84]   Further, Mr. Braskett has never made any effort to exclude Mrs. Braskett from his medicine cabinet.[85]

In the instant case, when Mr. Braskett left the prescription bottles in the master bathroom and medicine cabinet which Mrs. Braskett also had use of, he assumed the risk that Mrs. Braskett might permit that area to be searched.   Similarly, there is nothing in the record to support any effort to exclude Mrs. Braskett from the information on the outside of the prescrip-tion bottles.

On these facts, Fender and Tobey are entitled to summary judgment on this issue as a matter of law.   Their receipt of the information on the outside of the prescription bottles from the medicine cabinet was obtained by valid consent.

/ / /

/ / /

---

[82] Ex. 1, R. Braskett Depo. 72:21-73:1.

[83] Ex. 1, R. Braskett Depo. 73:6-11.

[84] Ex. 1, R. Braskett Depo. 73:12-24.

[85] Ex. 1, R. Braskett Depo. 70:9-12.

28 - MEMORANDUM OPINION AND ORDER

*III. Search of the garbage can and removal of prescription*
*bottles from the garbage can*

The defendants assert that Fender is entitled to summary judgment because she did not search the garbage can, or remove anything from the garbage can, whereas Tobey is entitled to summary judgment because he conducted a search with the consent of Mrs. Braskett.[86]  The defendants made a similar assertion concerning the removal of the gun from the master bedroom dresser.  Both officers returned to the Braskett residence on April 14, 2010, for the purpose of obtaining evidence that Mr. Braskett had prescriptions for his medications in his own name.  These arguments rise and fall together.  It would be an artificial distinction to say that Fender was not involved in the search of the garbage can.  The search of the garbage can was in connection with the officers' joint purpose for being there.

Braskett alleges the defendants violated his Fourth Amendment rights by searching through his garbage can on April 14, 2010.  The record reflects neither who placed the garbage can at the curb, nor when the garbage can was placed at the curb.  However, it appears it was Mr. Braskett, himself, who removed the prescription bottles from the computer room and placed them, along with the contents of the computer room wastebasket, in the garbage can on April 14, 2010.  It is unclear from the record exactly when Mr. Braskett put the prescription bottles in the garbage can.  There are two possibilities.  First, Mr. Braskett placed the prescription bottles in the garbage can in the garage, before the garbage can was taken

---

[86] Memo in Supp. of Defs.' Motion Summ. J., 16.

29 - MEMORANDUM OPINION AND ORDER

1 out to the curb.  Second, Mr. Braskett went to the curb and placed
2 the prescription bottles in the garbage can which had already been
3 taken out to the curb.  If it was the former, when the garbage can
4 was in the garage, it was in an area over which Mrs. Braskett had
5 common authority, and, as such, she could consent to a search of
6 the garbage can in that area.  If it was the latter, Mr. Braskett
7 had no expectation of privacy in the contents of the garbage can at
8 the curb for pickup.  As Mr. Braskett concedes, once garbage goes
9 to the curb, the owner has relinquished any privacy interest in its
10 contents.[87]

11    It is not disputed that Mrs. Braskett opened the garbage can
12 where Mr. Braskett's prescription bottles were found.  There is a
13 dispute as to who retrieved the bag from the garbage can; however,
14 that dispute is not material.  Even viewing the facts in the light
15 most favorable to the non-moving party, there would be no violation
16 of Mr. Braskett's Fourth Amendment rights arising from the
17 officers' removal of the prescription medication bottles from the
18 garbage can, as it was done with the consent of Mrs. Braskett.

19    Mr. Braskett has failed to establish the existence of a
20 genuine issue of material fact for trial.  Therefore, the
21 defendants' motion for summary judgment on this claim is granted.
22 / / /
23 / / /
24 / / /
25 / / /
26 / / /

27 _____

28    [87] Ex. 1, R. Braskett Depo. 152:17-20.

30 - MEMORANDUM OPINION AND ORDER

*IV.    Removal    of    confidential    medical    information    from*
      *prescription bottles*

Braskett alleges the defendants violated his Fourth Amendment rights by taking medical records.  Braskett considers the information contained on his prescription bottles to constitute a medical record.[88]  It is not clear, but the court assumes he pursues this theory with respect to the information on the prescription bottles from the medicine cabinet and from the garbage can in the garbage.

Braskett admits he did not always keep his prescription bottles secure in his medicine cabinet,[89] and he concedes that when he disposed of his prescription bottles, he did not attempt to remove any of his personal information contained on the bottles.[90] The plastic bag containing the empty prescription bottles was in the garbage can inside the garage, and perhaps at the curb, as well.  Mr. Braskett is aware that anybody could have accessed the garbage can while it was on the street.[91]  Before he discarded the prescription bottles, this record shows he left them in at least two locations: the computer room and the master bathroom.  Wherever Mr. Braskett kept his prescription bottles was, on this record, a place where Mrs. Braskett had unfettered access to the bottles and the information on their labels.    As previously discussed, she had common authority over both the locations from which prescription bottles were retrieved.

---

[88] Ex. 1, R. Braskett Depo. 72:21-73:1.

[89] Ex. 1, R. Braskett Depo. 73:6-11.

[90] Ex. 1, R. Braskett Depo. 73:2-24, 152:9-11.

[91] Ex. 1, R. Braskett Depo. 73:2-24: 104:5-105:24; 152:9-11.

Mrs. Braskett consented to the removal of the prescription bottles from the garbage can and from the medicine cabinet, and therefore, there was no violation of the Fourth Amendment with respect to the information on the outside of the bottles.  The defendants are entitled to summary judgment here, as well.

## CONCLUSION

For the reasons discussed above, The defendants' motion (Docket No. 30) for summary judgment is **GRANTED**.

IT IS SO ORDERED.

Dated this 3rd day of August, 2012.

/s/ Dennis J. Hubel

Dennis James Hubel
Unites States Magistrate Judge