1          UNITED STATES DISTRICT COURT

2              DISTRICT OF OREGON

3              PORTLAND DIVISION

4

5  RICHARD BRASKETT,            )
                                )
6              Plaintiff,       )        No. 03:11-cv-01078-HU
                                )
7        v.                     )
                                )
8  CELESTE FENDER and NATHAN    )    **MEMORANDUM OPINION AND ORDER**
   TOBEY,                       )    **ON MOTION FOR SUMMARY JUDGMENT**
9                               )
               Defendants.      )
10 ─────────────────────────────)

11

12

13 Kevin Keaney
   Kevin Keaney, P.C.
14 1631 N.E. Broadway, #540
   Portland, OR 97232
15
         Attorney for Plaintiff
16

17 Jennifer Johnston
   Deputy City Attorney
18 Robert Yamachika
   Deputy City Attorney
19 Office of City Attorney
   221 S.W. 4th Avenue, Room 430
20 Portland, OR 97204

21       Attorneys for Defendants

22

23

24

25 HUBEL, Magistrate Judge:

26     The plaintiff Richard Braskett brings this action under 42

27 U.S.C. § 1983, for alleged violations of his constitutional rights

28 by the defendants, in connection with events that occurred in April

1 - MEMORANDUM OPINION AND ORDER

1  2010.   The defendant Celeste Fender is a Detective with the
2  Portland Police Bureau ("PPB"), and the defendant Nathan Tobey is
3  a PPB Officer.   At the time of the incidents in question, both
4  Fender and Tobey were assigned to the PPB's Domestic Violence
5  Reporting Unit ("DVRU").   Braskett's claims in this case involve
6  the defendants' contacts with Braskett's wife Barbara Braskett
7  ("Mrs. Braskett"), and the defendants' search of the Brasketts'
8  residence on April 13, 2010.   Braskett asserts a single claim for
9  relief, alleging the defendants' actions on the date in question
10  violated Braskett's "right to be free of unreasonable search and
11  seizure under the Fourth Amendment and 42 USC 1983."   Dkt. #27,
12  Amended Complaint, ¶ 8.

13     The case currently is before the court on the defendants'
14  Motion for Summary Judgment.   Dkt. #30.   The defendants argue they
15  are entitled to judgment as a matter of law on Braskett's claim.
16  The motion has been briefed fully by the parties, and the court
17  heard oral argument on the motion on July 9, 2012.

18

19                    ***BACKGROUND FACTS***

20     The following facts are uncontroverted, unless otherwise
21  noted.

22     Mr. Braskett and Mrs. Braskett jointly purchased their current
23  residence in Vancouver, Washington, and they both are named on the
24  title to the property.[1]   In April 2010, Mrs. Braskett reported
25  verbal abuse by Mr. Braskett to a family friend, who is a former

26

27  ─────────────
28      [1] Declaration of Jennifer Johnston ("Johnston Decl."), Ex. 2,
    Deposition of Barbara Braskett, ("B. Braskett Depo.") 48:14-19.

2 - MEMORANDUM OPINION AND ORDER

1  PPB reserve police officer.[2]  On or around April 12 or 13, 2010,

2  Mrs. Braskett asked Mr. Braskett to move out of the family home.

3  Mrs. Braskett remained in the house with their two children.[3]

4       On the night of Monday, April 12, 2010, Detective Celeste

5  Fender and Officer Nathan Tobey went to the Braskett residence to

6  investigate an allegation of domestic violence and prescription

7  drug abuse by Mr. Braskett.[4]  Detective Fender attempted to call

8  the Braskett residence phone and knocked on the door on numerous

9  occasions, but there was no answer to either.[5]

10      On Tuesday, April 13, 2010, Fender and Tobey returned to the

11 Braskett residence to make contact with Mrs. Braskett.  They

12 identified themselves as PPB officers and members of the DVRU,

13 stating they were there to talk to Mrs. Braskett about her husband,

14 Mr. Braskett, and to make sure that Mrs. Braskett and the children

15 were okay.[6]

16      Mrs. Braskett invited Fender and Tobey into her home, and they

17 talked at the kitchen table.[7]  At the time of inviting Fender and

18 Tobey into the Braskett residence, Mrs. Braskett was aware that one

19

20      [2] Ex. 2, B. Braskett Depo. 18:9-19:9.

21      [3] Johnston Decl. Ex. 1, Deposition of Richard Braskett, ("R.
    Braskett Depo.") 31:19-23; Ex. 2, B. Braskett Depo. 69:20-70:24.
22

23      [4] Memo in Supp. of Defs.' Motion Summ. J., at 2.

24      [5] Johnston Decl. Ex. 3, Deposition of Celeste Fender Volumes
    I and II ("Ex. 3, Fender Depo.") 34:18-35:8.
25
        [6] Ex. 2, B. Braskett Depo. 77:4-22; Ex. 3, Fender Depo. 57:22-
26 58-5; Johnston Decl. Ex. 4, Deposition of Nathan Tobey, ("Tobey
    Depo.") 4:14-18; 6:16-19.
27
        [7] Ex. 2, B. Braskett Depo. 77:18-79:6; Ex. 3, Fender Depo.
28 58:5-7.

3 - MEMORANDUM OPINION AND ORDER

of the subjects about which the officers wanted to talk to her was Mr. Braskett's use of alcohol and other drugs.[8]

They talked, at the kitchen table, about the safety of Mrs. Braskett and the children, and about giving Mr. Braskett any assistance that he might need.[9]  Mrs. Braskett was relieved to talk to somebody from the PPB.[10]  She talked about the stress which both she and her husband were under.  Mr. Braskett's stress stemmed from an incident which happened a few years ago.[11]  Mrs. Braskett was concerned that this stress was causing Mr. Braskett to overuse prescription medication.

Both Mrs. Braskett and Mr. Braskett had prescriptions for painkiller medication.[12]  Mrs. Braskett thought Mr. Braskett's doctor was prescribing excessive amounts of medication, and when Mr. Braskett's medication ran out, he would take Mrs. Braskett's medication.  Mrs. Braskett was also concerned that Mr. Braskett was consuming more alcohol than usual, and he had become verbally abusive towards her.[13]  Mrs. Braskett began hiding her medication from Mr. Braskett so that he could not take hers.[14]

---

[8] Ex. 2, B. Braskett Depo. 18:2-19:4.

[9] Ex. 2, B. Braskett Depo. 79:7-15.

[10] Ex. 2, B. Braskett Depo. 127:8-15; 130:8-19; Ex. 4, Tobey Depo. 19:2-3.

[11] Ex. 4, Tobey Depo. 18:4-8.

[12] Ex. 4, Tobey Depo. 18:18-19.

[13] Ex. 2, B. Braskett Depo. 79:22-80:14; Ex. 3, Fender Depo. 68:7-11; Ex. 4, Tobey Depo. 18:10-11.

[14] Ex. 2, B. Braskett Depo. 89:14-19; Ex. 4, Tobey Depo. 18:18-22.

4 - MEMORANDUM OPINION AND ORDER

Mrs. Braskett clearly stated that while Mr. Braskett had become increasingly verbally abusive towards her, he had never been physically violent towards her or the children.[15] Mrs. Braskett said the situation had been causing her stress, and she had been seeking help for some time.[16]

In April 2010, Mrs. Braskett was teaching the fourth grade, and one of her students had thrown a chair at her, which caused her additional stress.[17] Mrs. Braskett told Fender and Tobey about the incident, and that she was taking sleeping pills as a result of the stress it had caused her.[18] Mrs. Braskett also had a painful shoulder injury at the time, and so she was taking a pain reliever/sleeping agent.[19]

Tobey does not recall Mrs. Braskett talking about incidents in her classroom, but does recall Mrs. Braskett informing the officers that she had taken sleeping pills the night before, and that was why she had not answered the door.[20]

Mrs. Braskett recalls Fender and Tobey specifically asking whether there were any firearms in the house.[21]   Mrs. Braskett

---

[15] Ex. 2, B. Braskett Depo. 79:16-21; Ex. 3, Fender Depo. 61:21-62:1; Ex. 4, Tobey Depo. 8:10-13.

[16] Ex. 2, B. Braskett Depo. 82:14-20; Ex. 4, Tobey Depo. 18:23-19:3.

[17] Ex. 2, B. Braskett Depo. 33:4-20.

[18] Declaration of Kevin Keaney ("Keaney Decl.") Ex. 1, B. Braskett Depo., ECF p. 38.

[19] Keaney Decl., Ex. 1, B. Braskett Depo. ECF p. 40.

[20] Ex. 4, Tobey Depo. 19:4-17.

[21] Ex. 2, B. Braskett Depo. 95:16-96:23.

5 - MEMORANDUM OPINION AND ORDER

communicated her concerns about Mr. Braskett's firearms around the
house, as their children might be able to access them, and she
asked Fender and Tobey to secure the firearms.[22]  Mrs. Braskett led
Fender and Tobey to the master bedroom, informed Fender and Tobey
that Mr. Braskett kept a gun in the dresser, and asked them to
remove the gun.   Tobey removed the gun.[23]   Tobey assumed that
Mrs. Braskett had access to the dresser.[24]  Mrs. Braskett allowed
Tobey to unload the ammunition from the gun.[25]  Fender did not enter
the dresser to remove the gun, and did not touch the gun at any
stage.[26]

      Mrs. Braskett did not want the gun in the house, so she opened
a combination lock gun safe in the garage.   Officer Tobey placed
the gun in the gun safe at Mrs. Braskett's request.[27]

      Mrs. Braskett was concerned about the light on the front porch
not working, so Fender and Tobey went to a nearby store and pur-
chased a new light bulb.   Tobey installed the new light bulb.[28]

_____

      [22] Ex. 3, Fender Depo. 72:13-16; 75:20-22.

      [23] Ex. 2, B. Braskett Depo. 97:7-13; Ex. 4, Tobey Depo. 23:20-
24:5.

      [24] Ex. 4, Tobey Depo. 27:8-28:6.

      [25] Ex. 2, B. Braskett Depo. 97:11-16; 156:10-12; Ex. 3, Fender
Depo. 73:1-4.

      [26] Declaration of Celeste Fender ¶3 ("Fender Decl."); Ex. 3,
Fender Depo. 72:12-21; 73:13-20; 79:7-12.

      [27] Ex. 2, B. Braskett Depo 97:17-98:2; Ex. 3, Fender Depo
73:13-15; Ex. 4, Tobey Depo 24:13-14.

      [28] Keaney Decl. Ex. 1, B. Braskett Depo. 95:2-11; Ex. 4, Tobey
Depo. 32:10-19.

6 - MEMORANDUM OPINION AND ORDER

1    Mrs. Braskett claims she was assured on numerous occasions
2    that the information which she imparted to Fender and Tobey would
3    remain confidential between the three of them.  Mrs. Braskett was
4    aware that Fender and Tobey were from the DVRU; however, she
5    believed their conversations would remain confidential because
6    there was no allegation of physical abuse by Mr. Braskett towards
7    Mrs. Braskett or their children.[29]  Tobey does not remember
8    Mrs. Braskett asking whether their conversation would remain
9    confidential.[30]

10    According to Fender, she called Mrs. Braskett on April 14,
11    2010, informing her that the PPB wanted to ensure Mr. Braskett had
12    his own prescription, and they arranged for Fender and Tobey to go
13    to the house after Mrs. Braskett finished work.[31]  Mrs. Braskett
14    does not recall any such phone call.[32]  Fender and Tobey arrived at
15    the Braskett residence shortly after 4:00 p.m.[33]  When Mrs. Braskett
16    arrived home from work with her children, she invited Fender and
17    Tobey inside the Braskett residence.[34]

18    / / /

19    / / /

20

21    [29] Ex. 2, B. Braskett Depo. 127:16-22; Keaney Decl. Ex. 1, B.
22    Braskett Depo. 127:16-129:24 (ECF pp. 33-34).

23    [30] Ex. 4, Tobey Depo. 19:22-24.

24    [31] Ex. 3, Fender Depo. 98:23-99:23.

25    [32] Ex. 2, B. Braskett Depo. 98:22-25.

26    [33] Ex. 3, Fender Depo. 101:5-12; Ex. 4, Tobey Depo. 34:18-22.

27    [34] Ex. 2, B. Braskett Depo. 100:4-5; Ex. 3, Fender Depo. 101:5-
28    22; Ex. 4, Tobey Depo. 34:22-24.

7 - MEMORANDUM OPINION AND ORDER

1    Mrs. Braskett went upstairs to retrieve one of Mr. Braskett's
2  medication bottles.[35]  Mrs. Braskett returned upset, and informed
3  Fender and Tobey that Mr. Braskett had been in the house during the
4  day, and had cleaned up and disposed of some prescription medica-
5  tion bottles, even though Mrs. Braskett had asked Mr. Braskett not
6  to enter the house.[36]

7    Mrs. Braskett obtained prescription bottles[37] from
8  Mr. Braskett's medicine cabinet in the master bathroom and showed
9  them to Fender.  Fender copied information from the label onto a
10 piece of paper, but she did not remove the prescription bottles
11 that came from the medicine cabinet from the Braskett residence.[38]
12 Mr. Braskett's prescription Vicodin bottle was not in the medicine
13 cabinet, and so was not part of the bottles which Mrs. Braskett
14 retrieved from that location and showed to Fender.[39]  Neither Fender
15 nor Tobey entered the master bedroom or en-suite bathroom on
16 April 14, 2010.[40]

17   Mrs. Braskett determined that Mr. Braskett had cleaned up
18 because she knew one of Mr. Braskett's empty prescription bottles

19

20 _____

21    [35] Ex. 3 Fender Depo. 102:10-11; Ex. 4 Tobey Depo. 35:3-10.

22    [36] Ex. 3 Fender Depo. 102:14-19: Ex. 4 Tobey Depo. 35:2-10,
23 41:8-10.

24    [37] For the purposes of clarity, "prescription bottles" refers
   exclusively to Mr. Braskett's medication bottles.

25
26    [38] Ex. 2, B. Braskett Depo. 101:8-102:2; 103:16-104:4.

27    [39] Ex. 2, B. Braskett Depo. 106:25-107:2.

28    [40] Ex. 2, B. Braskett Depo. 101:14-24; Declaration of Nathan
   Tobey ("Tobey Decl.") ¶¶ 3-6; Fender Decl. ¶ 4.

8 - MEMORANDUM OPINION AND ORDER

1   had been in the computer room, but was no longer there, and the
2   wastebasket[41] in the computer room had been emptied.[42]

3   The garbage had been picked up on that day, and either
4   Mrs. Braskett or her son had brought the garbage can from the
5   street back to the garage earlier that afternoon.[43]  Mrs. Braskett
6   discovered that there was still something in the garbage can,
7   either when her son retrieved the garbage can from the street and
8   Mrs. Braskett closed the lid, when she was retrieving the garbage
9   can from the street herself she realized there was still garbage
10  inside the garbage can, or when she realized the wastebasket in the
11  computer room had been emptied.[44]

12  Mrs. Braskett led Fender and Tobey to the garage to check the
13  garbage can for medication bottles which had been put in the
14  garbage can that day.[45]  According to Tobey, Mrs. Braskett opened
15  the lid to the garbage can.[46]  Fender does not recall who opened the
16  garbage can.[47]  The garbage can contained a clear plastic garbage

17

18  [41] For the purposes of clarity, "wastebasket" refers
19  exclusively to the one in the computer room.

20  [42] Ex. 2, B. Braskett Depo. 106:16-24; 159:13-19.

21  [43] For the purposes of clarity, "garbage can" refers exclu-
    sively to the household garbage can. (Mrs. Braskett describes it as
22  a "big blue thing, with a lid on wheels." Ex. 2, B. Braskett Depo.
    102:17.)  It is placed at the curb for periodic pickup by the
23  garbage service.

24  [44] Ex. 2, B. Braskett Depo. 102:4-21; 104:5-105:24; 106:7-
25  107:60; 159:13-19.

26  [45] Ex. 4, Tobey Depo. 42:1-6.

27  [46] Ex. 4, Tobey Depo. 35:14-19.

28  [47] Ex. 3, Fender Depo. 103:22-104:1.

9 - MEMORANDUM OPINION AND ORDER

1 bag, and one could clearly see that it contained Vicodin bottles.[48]
2 Mrs. Braskett said the bag contained what Mr. Braskett had cleaned
3 up during the day.[49]

4      Mrs. Braskett offered to get an umbrella with a hook so that
5 she could retrieve the garbage bag.[50]  Fender did not retrieve the
6 bag.[51]  Tobey does not remember who removed the bag from the garbage
7 can, but believes that Mrs. Braskett opened the garbage bag and
8 handed the bottles to Fender.[52]  Mrs. Braskett recalls Tobey
9 reaching into the garbage can, removing the bag of prescription
10 bottles from the garbage can, opening the bag, and removing the
11 prescription bottles from the bag.[53]

12      Fender does not recall whether she physically handled the
13 bottles at the Braskett residence, but when Fender and Tobey left
14 the Braskett residence, they took the empty medication bottles with
15 them.[54]

16 / / /
17 / / /
18 / / /
19

20      [48] Ex. 2, B. Braskett Depo. 159:21-24; Ex. 3, Fender Depo.
21 103:14-21; Ex. 4, Tobey Depo. 35:14-19.

22      [49] Ex. 4, Tobey Depo. 35:18-19.

23      [50] Ex. 2, B. Braskett Depo. 160:4-22.

24      [51] Ex. 3, Fender Depo. 103:24-104:1.

25      [52] Ex. 4, Tobey Depo. 35:14-17; 36:17-22; 42:20-43:3; 49:25-
26 50:2.

27      [53] Ex. 2, B. Braskett Depo. 107:12-20; 159:25-160-22.

28      [54] Ex. 3, Fender Depo. 104:9-13.

1                      ***SUMMARY JUDGMENT STANDARDS***

2          Summary judgment should be granted "if the movant shows that

3    there is no genuine dispute as to any material fact and the movant

4    is entitled to judgment as a matter of law."   Fed. R. Civ. P.

5    56(c)(2).   In considering a motion for summary judgment, the court

6    "must not weigh the evidence or determine the truth of the matter

7    but only determine whether there is a genuine issue for trial."

8    *Playboy Enters., Inc. v. Welles*, 279 F.3d 796, 800 (9th Cir. 2002)

9    (citing *Abdul-Jabbar v. General Motors Corp.*, 85 F.3d 407, 410 (9th

10   Cir. 1996)).   The Ninth Circuit Court of Appeals has described "the

11   shifting burden of proof governing motions for summary judgment" as

12   follows:

13               The moving party initially bears the burden of
                 proving the absence of a genuine issue of
14               material fact. *Celotex Corp. v. Catrett*, 477
                 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d
15               265 (1986).   Where the non-moving party bears
                 the burden of proof at trial, the moving party
16               need only prove that there is an absence of
                 evidence to support the non-moving party's
17               case. *Id.* at 325, 106 S. Ct. 2548. Where the
                 moving party meets that burden, the burden
18               then shifts to the non-moving party to
                 designate specific facts demonstrating the
19               existence of genuine issues for trial. *Id.* at
                 324, 106 S. Ct. 2548.   This burden is not a
20               light one.   The non-moving party must show
                 more than the mere existence of a scintilla of
21               evidence. *Anderson v. Liberty Lobby, Inc.*,
                 477 U.S. 242, 252, 106 S. Ct. 2505, 91 L. Ed.
22               2d 202 (1986).   The non-moving party must do
                 more than show there is some "metaphysical
23               doubt" as to the material facts at issue.
                 *Matsushita Elec. Indus. Co., Ltd. v. Zenith
24               Radio Corp.*, 475 U.S. 574, 586, 106 S. Ct.
                 1348, 89 L. Ed. 2d 528 (1986).   In fact, the
25               non-moving party must come forth with evidence
                 from which a jury could reasonably render a
26               verdict in the non-moving party's favor.
                 *Anderson*, 477 U.S. at 252, 106 S. Ct. 2505.
27               In determining whether a jury could reasonably
                 render a verdict in the non-moving party's
28               favor, all justifiable inferences are to be

11 - MEMORANDUM OPINION AND ORDER

1       drawn in its favor.  *Id.* at 255, 106 S. Ct.
2       2505.

3 *In re Oracle Corp. Securities Litigation*, 627 F.3d 376, 387 (9th
4 Cir. 2010).

5

6                          ***DISCUSSION***

7    In the Amended Complaint, Braskett brings this 42 U.S.C.
8 § 1983 claim alleging the defendants breached his Fourth Amendment
9 rights by entering the Braskett residence without his consent, and
10 conducting a search without a warrant or exigent circumstances.
11 Specifically, Braskett contends that in the course of the search,
12 the defendants violated his Fourth Amendment rights by searching
13 his medicine cabinet, taking medical records, going through the
14 garbage, and retrieving a handgun from the dresser.[55]  In the face
15 of the defendants' assertion that Mrs. Braskett consented to the
16 search, Mr. Braskett contends that, at the time, Mrs. Braskett did
17 not have the capacity to consent.

18    In addition, the defendants claim that even if Braskett could
19 show his constitutional rights were violated, the defendants are
20 entitled to summary judgment because qualified immunity shields
21 them from liability.  The defendants seek summary judgment on all
22 of Mr. Braskett's claims.

23

24                    **Burden of Proving Incapacity**

25    The parties dispute whether the burden of proving
26 Mrs. Braskett's capacity to consent to a search falls upon the

27 _____

28    [55] Johnston Decl., Ex. 1, R. Braskett Depo. 34:8-15.

12 - MEMORANDUM OPINION AND ORDER

1  defendants, as the state actors, or must be carried by
2  Mr. Braskett, as the civil plaintiff.  Mr. Braskett challenges the
3  officers' reliance on Mrs. Braskett's consent, claiming she was too
4  tired and too stressed to be able to make a voluntary decision to
5  consent.  He makes this argument with respect to each alleged
6  constitutional violation.

7      Mr. Braskett alleges the government always has the burden of
8  proving the existence of consent, citing *United States v. Shaibu*,
9  920 F.2d 1423, 1426 (9th Cir. 1990).[56]  The defendants respond that
10 *Shaibu* is a criminal case, and is inapplicable to this § 1983
11 claim.[57]  The defendants allege Mr. Braskett carries the burden of
12 proving lack of consent, citing Ninth Circuit authority.

13          [In] a criminal case, the government bears the
            burden of proving by a preponderance of the
14          evidence that consent was freely and volun-
            tarily given.  In a civil case under 42 U.S.C.
15          1983, however, the plaintiff carries the ulti-
            mate burden of establishing each element of
16          his or her claim, including lack of consent.

17 *Pavao v. Pagay*, 307 F.3d 915, 918-19 (9th Cir. 2002).

18     In *Larez v. Holcomb*, 16 F.3d 1513 (9th Cir. 1994), the
19 plaintiff brought a § 1983 action against police officers for
20 wrongful detention.  Larez was seized by officers and detained for
21 questioning in connection with a murder investigation in which her
22 brother was a suspect.  Larez claimed she thought she was under
23 arrest; she was taken to the police station and held, in handcuffs,
24 for two hours; and she neither consented to be questioned, nor
25 responded to officers' questions.  The officers told a different

26

27     [56] Pl.'s Opp'n to Defs.' Mot. Summ. J., at 8.

28     [57] Reply in Supp. of Defs.' Mot. for Summ. J., at 5.

1  story, claiming Larez was cooperative from the beginning; she
2  consented to being taken to the police station for questioning; and
3  she never was handcuffed.  The court held that while the burden of
4  producing evidence of consent may be placed on the defendant, the
5  risk of nonpersuasion remains with the plaintiff, who always has
6  the burden to prove a violation of the Fourth Amendment.  *Larez*, 16
7  F.3d at 1517 (citing *Ruggiero v. Krzeminski*, 928 F.2d 558, 563 (2d
8  Cir. 1991)).  *See also, e.g., Bogan v. City of Chicago*, 644 F.3d
9  563, 570 (7th Cir. 2011) (employing a "criminal burden of proof is
10 contrary to established principles governing civil trials, namely,
11 that 'the ultimate risk of nonpersuasion must remain squarely on
12 the plaintiff'") (citations omitted); *Valance v. Wisel*, 110 F.3d
13 1269, 1279 (7th Cir. 1997) (in a civil case, defendant must offer
14 evidence to meet or rebut the presumption that a warrantless search
15 is unreasonable, but plaintiff must prove consent was not given or
16 was invalid) (citing, *inter alia*, Fed. R. Evid. 301).

17      While *Larez* was a § 1983 case, that court did not consider the
18 issue of a third party's consent.  Having examined the case law
19 surrounding § 1983 claims, it would appear that the issues arising
20 in this case are somewhat unique.  Neither counsel for the
21 plaintiff, nor the defendants, has made known to the court any case
22 which concerned a § 1983 claim alleging a violation of the Fourth
23 Amendment, where the plaintiff challenged the capacity of a third
24 party to consent, after the § 1983 defendants relied on that third
25 party's consent to justify their search.  I note the defendants
26 here plead the consent of Mrs. Braskett as an affirmative defense
27 to avoid the § 1983 claim of a constitutional violation.  *See* Fed.
28 R. Civ. P. 8(c)(1) (requiring a party to state a matter of

14 – MEMORANDUM OPINION AND ORDER

1  avoidance as an affirmative defense).   On these facts, it seems
2  appropriate that Braskett must prove he did not consent to any
3  search, but if the defendants want to avoid a constitutional
4  violation by relying on Mrs. Braskett's consent, they should have
5  the burden of proving its validity.   However, resolution of who has
6  this burden is not essential in deciding this motion for summary
7  judgment.   To avoid summary judgment, Braskett is required to raise
8  a material question of fact about the capacity of Mrs. Braskett to
9  consent to a search of the Braskett residence.   I turn to that
10 issue.

11     "[W]hether a consent to a search was in fact 'voluntary' or
12 was the product of duress or coercion, express or implied, is a
13 question of fact to be determined from the totality of all the
14 circumstances." *United States v. Garcia*, 997 F.2d 1273, 1281-82
15 (9th Cir. 1993) (citing *Schneckloth v. Bustamonte*, 412 U.S. 218,
16 226-27, 93 S. Ct. 2041, 2047-28, 36 L. Ed. 2d 854 (1973)).   Both
17 parties agree that this holistic standard is the proper test in the
18 instant case.[58]   Braskett claims that all of the factors weighing
19 upon Mrs. Braskett on the night of April 13, 2010, made her
20 incapable of consenting.   The defendants assert the factors
21 weighing upon Mrs. Braskett that night were not sufficiently
22 incapacitating so as to prevent her from consenting to a search of
23 the Braskett residence.

24     The defendants cite numerous cases concerning the threshold
25 for a finding of incapacity to consent.   The cases set the bar

---

27
28     [58] Reply in Supp. Defs.' Mot. Summ. J., at 10; Pl.'s Opp'n to
    Defs.' Mot. Summ. J., at 8.

15 - MEMORANDUM OPINION AND ORDER

quite high for a finding of incapacity.   In *United States v.*
*George*, 987 F.2d 1428 (9th Cir. 1993), the defendant had overdosed
on heroin, and was questioned by police several hours later, while
he was still in critical condition.   The court held the defendant's
consent for officers to search his hotel room was voluntary,
finding his condition "did not render him unconscious or comatose,"
and his consent was not coerced by the police.   *George*, 987 F.2d at
1430. Similarly, in *United States v. Martin*, 781 F.2d 671 (9th Cir.
1985), the defendant was questioned by police in the hospital,
while he was under the influence of pain medication.   The court
held the defendant's consent to search was voluntary:

> Martin was awake and relatively coherent
> during the questioning at the hospital. . . .
> There is no evidence of extended and oppres-
> sive questioning.   Nor had Martin received
> excessive quantities or unusual combinations
> of drugs.   Martin's injuries, while painful,
> did not render him unconscious or comatose.
> Moreover, Martin said that he wanted to talk
> to the officers and was not reluctant to tell
> his story.

*Martin*, 781 F.2d at 674.

    In *United States v. Freyre-Lazero*, 3 F.3d 1496 (11th Cir.
1993), involving a factual situation similar to the one in the case
at hand, the defendant alleged his wife was unable to consent to a
search of the defendant's home because she was emotionally
distraught after having seen her son being arrested earlier that
day.   The court affirmed the district court's finding that the wife
was capable of consenting, noting she had a "rational demeanor,"
and although she had witnessed her son's arrest, "both detectives
testified that she was not too distraught to comprehend the
implications of the search."   *Freyre-Lazero*, 3 F.3d at 1501.   *See*

16 - MEMORANDUM OPINION AND ORDER

1  *also United States v. Mancias*, 350 F.3d 800, 805-06 (8th Cir. 2003)
2  (defendant's extreme fatigue did not render his consent
3  involuntary); *United States v. Duran*, 957 F.2d 499, 503 (7th Cir.
4  1992) ("[T]he fact that a consenting party is extremely upset at
5  the time she consents is not dispositive. . . . [A]bsent a showing
6  that her emotional distress was so profound as to impair her
7  capacity for self-determination or understanding of what the police
8  were seeking, it is not enough to tip the balance towards finding
9  that her consent was involuntary.").

10      Examining all of the factors in the instant case, the record
11  does not reflect circumstances or factors which caused
12  Mrs. Braskett to be incapable of consenting.  In April 2010,
13  Mrs. Braskett was an elementary school teacher, and was capable of
14  attending work, driving her car, and caring for her children.[59]  She
15  expressed concerns about her husband's alleged use of alcohol and
16  other drugs, and other stressors in their lives.  When asked
17  whether there were any guns in the house, Mrs. Braskett not only
18  recalled that there was a gun and its location, she led the
19  defendants to the gun, and asked them to unload it and to place it
20  in the gun safe.  She then took the defendants to the garage and
21  unlocked the gun safe.  These are not the actions of an incoherent
22  or markedly impaired individual.  They raise no issue about her
23  capacity to consent.

24      There is no evidence here of extended or oppressive
25  questioning.  Other evidence shows Mrs. Braskett was capable of

---

28  [59] Ex. 2, B. Braskett Depo. 70:21-22; Ex. 3, Fender Depo.
    101:11-22.

17 - MEMORANDUM OPINION AND ORDER

1   rational decision-making.  She told the officers she had taken
2   Tylenol PM, a painkiller with a sleeping agent, because she did not
3   want to mix Motrin, which she was taking for her injured shoulder,
4   with a regular sleeping agent.[60]  I find that while Mrs. Braskett
5   had a painful shoulder injury at the time, and was under some
6   degree of stress due to other events in her life, no reasonable
7   juror could find, on these facts, that Mrs. Braskett did not
8   voluntarily consent to the "searches," given the standards for that
9   analysis in the Ninth Circuit.  Regardless of who has the burden of
10  persuasion on the issue of Mrs. Braskett's capacity to consent,
11  Mr. Braskett has not shown the existence of a material issue of
12  fact in that regard.

13
14                              **Ruse**

15      Mr. Braskett further alleges that Fender and Tobey obtained
16  entry into the Braskett residence through a lie.  Mr. Braskett
17  claims Fender and Tobey went to the Braskett residence and told
18  Mrs. Braskett they were there to talk about her safety when, in
19  fact, they were there to conduct a criminal investigation into
20  Mr. Braskett's use of drugs.  As such, Mr. Braskett claims that
21  before Mrs. Braskett invited Fender and Tobey into the house, they
22  lied about the purpose of their visit.  Mr. Braskett argues this
23  was impermissible.  During oral argument, Mr. Braskett's counsel
24  cited the recent case of *Cohen v. Boyle*, slip op., 2012 WL 1292431
25  (W.D. Wash. Apr. 16, 2012), for the proposition that although
26  officers may use a ruse to gain entry to a residence in some

27
28      [60] Keaney Decl., Ex. 1, B. Braskett Dep, ECF p. 40.

18 - MEMORANDUM OPINION AND ORDER

1  circumstances, it is impermissible for officers to gain entry into
2  a residence by "'misrepresenting the scope, nature or purpose of a
3  government investigation.'" *Cohen*, 2012 WL 1292431 at *9 (quoting
4  *United States v. Bosse*, 898 F.2d 113, 115 (9th Cir. 1990)).[61]

5      *Cohen*, itself, is not on point here, and *Bosse* and other Ninth
6  Circuit precedents cited by the *Cohen* court would actually support
7  the defendants' position - if, in fact, they had employed a ruse to
8  gain entry into the residence.    However, I find no ruse was
9  employed.    The record indicates that at the time Mrs. Braskett
10 invited Fender and Tobey into the residence on April 13, 2010, she
11 was aware that one of the subjects about which the officers wanted
12 to talk to her was the safety of her and her children.    The only
13 "search" on that date involved Mr. Braskett's gun.    On April 14,
14 2010, Mrs. Braskett was aware the officers were there regarding
15 prescription pill bottles.    She went looking for them.    Those were
16 the    only    items    involved    in    the    "searches"    on    the    14th.
17 Mrs. Braskett concedes she knew, in April 2010, that the officers
18 were at the house regarding Mr. Braskett's use of prescription
19 medications.    She knew that on either the 13th, or the 14th, or
20 both.  Because she knew it at least by the 14th, there was no ruse.
21 I find Mrs. Braskett voluntarily consented to the officers' entry
22 into the residence on both dates.    She was not impermissibly misled
23 by their statements regarding why they were there.    The searches
24 were not unconstitutional on this basis.
25 / / /
26 / / /
27
28      [61] *See* Oral Argument Tr., July 9, 2012, at 50:13-51:4.

19 - MEMORANDUM OPINION AND ORDER

### 42 U.S.C. § 1983 Violations

Section 1983 provides, in relevant part, that "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

A plaintiff raising a 42 U.S.C. § 1983 claim must show that a person acting under color of state law deprived him of a constitutional right. *Dowe v. Total Action Against Poverty*, 145 F.3d 653, 658 (4th Cir. 1998).  Section 1983 "is not itself a source of substantive rights, but merely provides a method for vindicating federal rights elsewhere conferred.  The first step in any such claim is to identify the specific constitutional right allegedly infringed." *Albright v. Oliver*, 510 U.S. 266, 114 S. Ct. 807, 811-812, 127 L. Ed. 2d 114 (1994) (internal citations and quotation marks omitted).


### Fourth Amendment Violations

The Fourth Amendment provides that "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated. . . ." U.S. Const. Amend. IV.

The Fourth Amendment is violated when a search is conducted without a warrant issued upon probable cause.  A warrantless search is "per se unreasonable. . . subject only to a few specifically

20 - MEMORANDUM OPINION AND ORDER

1 established and well-delineated exceptions." *Schneckloth v.*
2 *Bustamonte*, 412 U.S. 218, 219, 93 S. Ct. 2041, 2043, 36 L. Ed. 2d
3 854 (1973).

4      "The prohibition does not apply, however, to situations in
5 which voluntary consent has been obtained, either from the
6 individual whose property is searched, or from a third party who
7 possesses common authority over the premises." *Illinois v.*
8 *Rodriguez* 497 U.S. 177, 181, 110 S. Ct. 2793, 2797, 111 L. Ed. 2d
9 148 (1990)(internal citations omitted).

10           Common authority is, of course, not to be
             implied from the mere property interest a
11           third party has in the property.  The
             authority which justifies the third-party
12           consent does not rest upon the law of
             property, with its attendant historical and
13           legal refinements but rests rather on mutual
             use of the property by persons generally
14           having joint access or control for most
             purposes, so that it is reasonable to
15           recognize that any of the co-inhabitants has
             the right to permit the inspection in his own
16           right and that the others have assumed the
             risk that one of their number might permit the
17           common area to be searched.

18 *United States v. Matlock*, 415 U.S. 164, 171 n.7, 94 S. Ct. 988, 993
19 n.7, 39 L. Ed. 2d 242(1974) (internal citations omitted).

20      In a § 1983 claim such as this, to avoid summary judgment, a
21 plaintiff must raise a material issue of fact regarding whether the
22 person giving consent had common authority over the area searched.
23 The *Matlock* Court held that "the consent of one who possesses
24 common authority over premises or effects is valid as against the
25 absent, nonconsenting person with whom that authority is shared."
26 *Matlock*, 415 U.S. at 170, 94 S. Ct. at 993.

27      The Ninth Circuit has summarized post-*Matlock* cases as
28 requiring that "a consent-giver with limited access to the searched

21 - MEMORANDUM OPINION AND ORDER

1  property lacks actual authority to consent to a search. . . .  The

2  cases upholding searches generally rely on the consent-giver's

3  unlimited access to property to sustain the search." *U.S. v. Kim*,

4  105 F.3d 1579, 1582 (9th Cir. 1997).

5      The Ninth Circuit has upheld a spouse's authority to consent

6  to police entering a property in which both she and the defendant

7  lived as co-tenants, finding the consent-giver was a joint-user of

8  the property, with full access to the property, and as such, could

9  consent to the police searching the property. *United States v.*

10 *Guzman*, 852 F.2d 1117, 1121 (9th Cir. 1988).  In *United States v.*

11 *Sealey* 830 F.2d 1028 (9th Cir. 1987), the defendant's spouse

12 consented to police searching the property.  The Ninth Circuit

13 found the defendant's wife had mutual access to the entire

14 property, she was part owner of the residence, she was married to

15 the defendant, and she had full access to all parts of the

16 residence.  The defendant asserted that he retained sole ownership

17 over sealed containers, to the exclusion of his wife.  However, the

18 Ninth Circuit rejected this assertion because, on the facts, the

19 defendant had failed to mark the containers in such a way as to

20 indicate his sole ownership.

21

22                          **Analysis**

23      In this case, Braskett claims the defendants entered his home,

24 conducted a search with neither a warrant nor exigent circum-

25 stances, and removed property from the Braskett residence, all

26 without his consent.  Braskett alleges these actions violated his

27 right to be free from "unreasonable search and seizure under the

28

Fourth Amendment."[62]  Specifically, Braskett contends that in the course of the search, the defendants violated his Fourth Amendment rights by searching his medicine cabinet, taking medical records, going through the garbage, and retrieving a handgun from the dresser.  Braskett contends that at the time, Mrs. Braskett was incapable of consenting.

On or around April 12, 2010, Mrs. Braskett asked Mr. Braskett to move out of the family home.  Mrs. Braskett remained in the house with their two children.[63]  On Tuesday, April 13, 2010, Fender and Tobey went to the Braskett residence, identified themselves to Mrs. Braskett as members of the PPB, and talked with Mrs. Braskett at the kitchen table.[64]

Mr. and Mrs. Braskett are both on the title to the property. They both had unfettered access to the entire house.  Neither of them, on this record, had ever physically or verbally excluded the other from an area within the house.[65]  In fact, on the dates in question, there is no material issue of fact that Mrs. Braskett had "common authority" over all areas of the residence, and thus was able to validly consent to the defendants' search of the residence.

/ / /

/ / /

---

[62] First Amend. Comp. ¶¶ 7 & 8.

[63] Ex. 1, R. Braskett Depo. 31:19-23; Ex. 2, B. Braskett Depo. 69:20-70:24.

[64] Ex. 3, Fender Depo. 58:5-7; Ex. 2, B. Braskett Depo. 77:18-79:6.

[65] Ex. 1, R. Braskett Depo. 70:1-8; 81:2-5; Ex. 2, B. Braskett Depo. 110:13-16; 111:5-8.

23 - MEMORANDUM OPINION AND ORDER

*I.    Removal of gun from master bedroom dresser*

While sitting at the kitchen table on April 13, 2010, Mrs. Braskett expressed her concern about Mr. Braskett's firearms around the house, and the danger they posed should their children gain access to them.[66]  Mrs. Braskett led Fender and Tobey to the master bedroom, informed them that Mr. Braskett had a gun in the dresser, and asked them to remove the gun. Tobey entered the bedroom and removed the gun.[67]  Fender did not enter the dresser to remove the gun, and did not touch the gun at any stage.[68]  Tobey assumed that Mrs. Braskett had access to the dresser.[69] Mrs. Braskett allowed Tobey to unload the ammunition from the gun.[70] Mrs. Braskett opened the gun safe in the garage.  The gun safe had a touchpad lock to which Mrs. Braskett knew the combination.[71] Tobey placed the gun in the safe in the garage because Mrs. Braskett did not want the gun in the house.[72]  Neither Fender nor Tobey removed the firearm from the Braskett residence at any time.

---

[66] Ex. 3, Fender Depo. 72:13-16; 75:20-22.

[67] Ex. 2, B. Braskett Depo. 97:7-13; Ex. 4, Tobey Depo. 23:20-24:5.

[68] Fender Decl. ¶3; Ex. 3, Fender Depo. 72:12-21; 73:13-20; 79:7-12.

[69] Ex. 4, Tobey Depo. 27:8-28:6.

[70] Ex. 2, B. Braskett Depo. 97:11-16; 156:10-12; Ex. 3, Fender Depo. 73:1-4.

[71] Ex. 2, B. Braskett Depo. 97:11-24.

[72] Ex. 2, B. Braskett Depo. 97:25-98:2; Ex. 4 Tobey Decl. 24:13-14.

24 - MEMORANDUM OPINION AND ORDER

1    The defendants allege that Fender is entitled to summary
2 judgment because she, unlike Tobey, did not touch the gun at any
3 point.[73] One of the reasons Fender and Tobey went to the Braskett
4 residence was to ensure that Mrs. Braskett and her children were
5 safe.[74] The removal of the gun from the master bedroom dresser, and
6 its subsequent placement in the gun safe, was in line with the
7 purpose of ensuring the safety of Mrs. Braskett and her children.
8 Both officers were at the residence inquiring about Mrs. Braskett's
9 safety.  It would be an artificial distinction, and contrary to
10 Fender's announced purpose for being there, to find that Fender was
11 not involved in the removal of the gun from the master bedroom
12 dresser.  She was present in the Braskett residence when Tobey
13 moved the gun to ensure the safety of Mrs. Braskett and her
14 children.  Both officers were involved in the safety conversation.

15    However, there are no issues of material fact with respect to
16 the gun.  Mrs. Braskett had common authority over the entire
17 Braskett residence.  She knew the gun was in the dresser, and knew
18 the combination code for the gun safe.  This is consistent with her
19 having "common authority" over at least those areas associated with
20 the guns in the house.  Tobey only entered the dresser at the
21 request of and with the consent of Mrs. Braskett.  The defendants
22 are entitled to summary judgment with respect to the gun because
23 the "search," which defendant does not contest for purposes of this
24 motion, was done with appropriate consent.

25

26    [73] Memo in Supp. of Defs.' Motion Summ. J., 14.
27
28    [74] Ex. 2, B. Braskett Depo. 77:13-17; Ex. 4, Tobey Depo. 12:20-25.

25 - MEMORANDUM OPINION AND ORDER

1  *II.  Search of the medicine cabinet*

2       On April 14, 2010, Fender and Tobey returned to the Braskett

3  residence to determine whether Mr. Braskett had his own prescrip-

4  tion for painkiller medication.[75]  Mrs. Braskett arrived home from

5  work, and invited Fender and Tobey inside the Braskett residence.[76]

6  Mrs. Braskett went upstairs to retrieve one of Mr. Braskett's

7  medication bottles, but she was unable to find one initially

8  because Mr. Braskett had been in the house and gotten rid of them.[77]

9  Mrs. Braskett obtained prescription bottles from her husband's

10 medicine cabinet in the master bathroom and showed them to Fender,

11 who wrote information from the labels on a piece of paper, but did

12 not remove the bottles from the Braskett residence.[78]   Neither

13 Fender nor Tobey ever went into either the medicine cabinet or the

14 master bathroom on April 14, 2010.[79]

15      The record illustrates that there was no part of the Braskett

16 residence from which either spouse was excluded.  *Matlock* made the

17 point that common authority is not derived from a proprietary

18 interest, but rather is based upon the mutual use of the property

19 such that "it is reasonable to recognize that any of the co-

20 inhabitants has the right to permit the inspection in his own right

21

22

23      [75] Tobey Depo. 34:18-22; Ex. 3, Fender Depo. 101:5-12.

24      [76] Ex. 3, Fender Depo. 101:5-22; Ex. 4, Tobey Depo. 34:22-24;
    Ex. 2, B. Braskett Depo. 100:4-5.

25
        [77] Ex. 3, Fender Depo. 102:8-19; Ex. 4, Tobey Depo. 35:3-10.
26
        [78] Ex. 2, B. Braskett Depo. 101:8-102:2; 103: 16-104:4.
27
28      [79] Ex. 2, B. Braskett Depo, 101:8-25; Ex. 3, Fender Depo.
    133:15-21; Tobey Decl. ¶6; Fender Decl. ¶4.

26 - MEMORANDUM OPINION AND ORDER

1  and that the others have assumed the risk that one of their number
2  might permit the common area to be searched." *Matlock*, 415 U.S. at
3  171 n.7, 94 S. Ct. at 993 n.7.

4        Braskett claims that when he left his medication in the
5  bathroom, he had a reasonable expectation of privacy, as he did not
6  expect the PPB to come to his home.[80]  The Ninth Circuit considered
7  the scope of the mutual use doctrine in *United States v. Welch*, 4
8  F.3d. 761 (9th Cir. 1993).  There, McGee and Welch rented a car and
9  drove to Las Vegas.  Both were subsequently arrested.  McGee
10  consented to a search of the car.  The Ninth Circuit upheld the
11  search of the car because both McGee and Welch had joint access to
12  and mutual use of it, and "by sharing access to and use of the car
13  with McGee, Welch relinquished, in part, her expectation of privacy
14  in Fourth Amendment interests in the car."  *Welch*, 4 F.3d at 764.
15  However, the court found Welch did not relinquish her expectation
16  of privacy in her purse which was in the car.  *Id.*  "The shared
17  control of 'host' property does not serve to forfeit the expecta-
18  tion of privacy in containers within that property."  *Id.* (internal
19  citations and quotation marks omitted).

20        When applied to the instant case, Mr. Braskett apparently
21  contends that, irrespective of Mrs. Braskett's authority over the
22  master bathroom and medicine cabinet (i.e., the "host property"),
23  Mr. Braskett had not necessarily forfeited an expectation of
24  privacy in the medical records contained therein.[81]  Mr. Braskett
25  considers each of the prescription bottles to constitute a
26

27        [80] Oral Arg. Tr., July 9, 2012, at 56:21-57:9.

28        [81] Ex. 1, R. Braskett Depo. 72:16-20.

27 - MEMORANDUM OPINION AND ORDER

confidential medical record.[82]    Here, Mr. Braskett fails to
substantiate his claim that he had retained a reasonable expecta-
tion of privacy in the medical information contained on his
prescription bottles.    Rather, than storing his prescription
bottles exclusively in his medicine cabinet, Mr. Braskett concedes
that, on occasion, he left his prescription bottles around the
house.[83]    When Mr. Braskett disposed of his prescription bottles,
he did nothing to destroy the "confidential medical records"
contained on those bottles.[84]    Further, Mr. Braskett has never made
any effort to exclude Mrs. Braskett from his medicine cabinet.[85]

In the instant case, when Mr. Braskett left the prescription
bottles in the master bathroom and medicine cabinet which
Mrs. Braskett also had use of, he assumed the risk that
Mrs. Braskett might permit that area to be searched.    Similarly,
there is nothing in the record to support any effort to exclude
Mrs. Braskett from the information on the outside of the prescrip-
tion bottles.

On these facts, Fender and Tobey are entitled to summary
judgment on this issue as a matter of law.    Their receipt of the
information on the outside of the prescription bottles from the
medicine cabinet was obtained by valid consent.

/ / /

/ / /

---

[82] Ex. 1, R. Braskett Depo. 72:21-73:1.

[83] Ex. 1, R. Braskett Depo. 73:6-11.

[84] Ex. 1, R. Braskett Depo. 73:12-24.

[85] Ex. 1, R. Braskett Depo. 70:9-12.

28 - MEMORANDUM OPINION AND ORDER

1 *III. Search of the garbage can and removal of prescription*
2 *bottles from the garbage can*

3   The defendants assert that Fender is entitled to summary
4 judgment because she did not search the garbage can, or remove
5 anything from the garbage can, whereas Tobey is entitled to summary
6 judgment because he conducted a search with the consent of
7 Mrs. Braskett.[86]  The defendants made a similar assertion concerning
8 the removal of the gun from the master bedroom dresser.  Both
9 officers returned to the Braskett residence on April 14, 2010, for
10 the purpose of obtaining evidence that Mr. Braskett had prescrip-
11 tions for his medications in his own name.  These arguments rise
12 and fall together.  It would be an artificial distinction to say
13 that Fender was not involved in the search of the garbage can.  The
14 search of the garbage can was in connection with the officers'
15 joint purpose for being there.

16   Braskett alleges the defendants violated his Fourth Amendment
17 rights by searching through his garbage can on April 14, 2010.  The
18 record reflects neither who placed the garbage can at the curb, nor
19 when the garbage can was placed at the curb.  However, it appears
20 it was Mr. Braskett, himself, who removed the prescription bottles
21 from the computer room and placed them, along with the contents of
22 the computer room wastebasket, in the garbage can on April 14,
23 2010.  It is unclear from the record exactly when Mr. Braskett put
24 the prescription bottles in the garbage can.  There are two
25 possibilities.  First, Mr. Braskett placed the prescription bottles
26 in the garbage can in the garage, before the garbage can was taken

27 _____

28   [86] Memo in Supp. of Defs.' Motion Summ. J., 16.

29 - MEMORANDUM OPINION AND ORDER

1  out to the curb.  Second, Mr. Braskett went to the curb and placed
2  the prescription bottles in the garbage can which had already been
3  taken out to the curb.  If it was the former, when the garbage can
4  was in the garage, it was in an area over which Mrs. Braskett had
5  common authority, and, as such, she could consent to a search of
6  the garbage can in that area.  If it was the latter, Mr. Braskett
7  had no expectation of privacy in the contents of the garbage can at
8  the curb for pickup.  As Mr. Braskett concedes, once garbage goes
9  to the curb, the owner has relinquished any privacy interest in its
10 contents.[87]

11      It is not disputed that Mrs. Braskett opened the garbage can
12 where Mr. Braskett's prescription bottles were found.  There is a
13 dispute as to who retrieved the bag from the garbage can; however,
14 that dispute is not material.  Even viewing the facts in the light
15 most favorable to the non-moving party, there would be no violation
16 of Mr. Braskett's Fourth Amendment rights arising from the
17 officers' removal of the prescription medication bottles from the
18 garbage can, as it was done with the consent of Mrs. Braskett.

19      Mr. Braskett has failed to establish the existence of a
20 genuine issue of material fact for trial.  Therefore, the
21 defendants' motion for summary judgment on this claim is granted.
22 / / /
23 / / /
24 / / /
25 / / /
26 / / /

27

28      [87] Ex. 1, R. Braskett Depo. 152:17-20.

30 - MEMORANDUM OPINION AND ORDER

*IV.  Removal of confidential medical information from
      prescription bottles*

Braskett alleges the defendants violated his Fourth Amendment rights by taking medical records.  Braskett considers the information contained on his prescription bottles to constitute a medical record.[88]  It is not clear, but the court assumes he pursues this theory with respect to the information on the prescription bottles from the medicine cabinet and from the garbage can in the garbage.

Braskett admits he did not always keep his prescription bottles secure in his medicine cabinet,[89] and he concedes that when he disposed of his prescription bottles, he did not attempt to remove any of his personal information contained on the bottles.[90] The plastic bag containing the empty prescription bottles was in the garbage can inside the garage, and perhaps at the curb, as well.  Mr. Braskett is aware that anybody could have accessed the garbage can while it was on the street.[91]  Before he discarded the prescription bottles, this record shows he left them in at least two locations: the computer room and the master bathroom.  Wherever Mr. Braskett kept his prescription bottles was, on this record, a place where Mrs. Braskett had unfettered access to the bottles and the information on their labels.    As previously discussed, she had common authority over both the locations from which prescription bottles were retrieved.

---

[88] Ex. 1, R. Braskett Depo. 72:21-73:1.

[89] Ex. 1, R. Braskett Depo. 73:6-11.

[90] Ex. 1, R. Braskett Depo. 73:2-24, 152:9-11.

[91] Ex. 1, R. Braskett Depo. 73:2-24: 104:5-105:24; 152:9-11.

31 - MEMORANDUM OPINION AND ORDER

1   Mrs. Braskett consented to the removal of the prescription
2   bottles from the garbage can and from the medicine cabinet, and
3   therefore, there was no violation of the Fourth Amendment with
4   respect to the information on the outside of the bottles.  The
5   defendants are entitled to summary judgment here, as well.

6

7                              **CONCLUSION**

8       For the reasons discussed above, The defendants' motion
9   (Docket No. 30) for summary judgment is **GRANTED**.

10      IT IS SO ORDERED.

11                     Dated this 3rd day of August, 2012.

12

13                     /s/ Dennis J. Hubel
                       _____
14                     Dennis James Hubel
                       Unites States Magistrate Judge

15

16

17

18

19

20

21

22

23

24

25

26

27

28

32 - MEMORANDUM OPINION AND ORDER